GENERAL INSTRUMENT CORPORATION, F. W. SICKLES DIVISION, Plaintiff,

v.

PENNSYLVANIA PRESSED METALS, INC., Defendant,

v.

TENNECO CHEMICALS, INC., Third Party Defendant.

Civ. No. 71–29.

United States District Court, M. D. Pennsylvania.

Nov. 13, 1973.

**140**

Russell O'Malley, Nogi, O'Malley & Harris, Scranton, Pa., John M. Phelan, Morgan, Lewis & Bockius, Philadelphia, Pa., for plaintiff.

Joseph J. Malizia, Rydesky & Malizia, Emporium, Pa., John M. Feeney, Harrington, Feeney & Schweers, Pittsburgh, Pa., for defendant.

J. Neafie Mitchell, Williamsport, Pa., for third party defendant.

## OPINION

MUIR, District Judge.

### I. FINDINGS OF FACT

1. Plaintiff General Instrument Corporation ("plaintiff") was a Delaware corporation with its principal place of business in New York City, New York, at the commencement of this action (Uncontested Statement of Facts No. 1).

2. Defendant Pennsylvania Pressed Metals, Inc. ("defendant") was a Pennsylvania corporation with its principal place of business in Emporium, Pennsylvania, at the commencement of this action. (Uncontested Statement of Facts No. 2).

3. Third-party defendant Tenneco Chemicals, Inc. ("third-party defendant") had its principal place of business in Chestertown, Maryland, at the commencement of this action. (Uncontested Statement of Facts No. 3).

4. The amount in controversy is in excess of $10,000. (Uncontested Statement of Facts No. 4).

5. Plaintiff was a contractor under a contract with the United States Government for the manufacture of a bomb fuse described as the M 904E2 bomb fuse (Uncontested Statement of Facts No. 5).

6. Defendant's business is the manufacture of pressed powdered metal parts. (Tr. June 13, 1973, p. 157).

7. Third-party defendant is and its predecessor was a manufacturer of a lubricant known as Anderol 401D which was used by defendant to impregnate sleeve bearings sold to plaintiff. (Uncontested Statement of Facts No. 7).

8. The bronzed metal sleeve bearings which are the subject matter of this suit were manufactured during 1968 and 1969 by the defendant for three separate bomb fuse contractors, plaintiff herein, Raytheon and Honeywell Manufacturing Company. (Tr. June 14, 1973, p. 225).

9. In the manufacture of the sleeve bearings, the metal powder was placed into a die in a press, compacted into the desired configuration, and then ejected from the press. (Tr. June 14, 1973, p. 156).

10. After the initial molding the parts were put through an oven and baked or sintered at a temperature of

between 1500 and 1520 degrees for approximately 45 minutes. This resulted in a certain degree of melting of the powdered metal causing it to bond together into a solid piece. (Tr. June 14, 1973, p. 159).

11. The sintering process resulted in some distortion because of the melting so that after the part was cooled, it had to be run through a sizing press that corrected any dimensional distortion and returned the piece to the initial shape and dimensions. (Tr. June 14, 1973, p. 159).

12. Where parts were to be later impregnated with a special lubricant this same lubricant was used as a coolant during the sizing operation. A special oil, Anderol 401D, was normally used as a coolant during the sizing operation of the bearings manufactured by defendant for plaintiff. (Tr. June 14, 1973, p. 160).

13. After the parts were sized they were inspected for dimensional characteristics, structural strength, and porosity. (Tr. June 14, 1973, p. 161).

14. After the testing was completed, the parts were impregnated with oil which resulted in oil being imparted to the interior portions of the part as well as the surface. (Tr. June 14, 1973, p. 162).

15. The purpose of impregnating a part with oil is to create a permanent reservoir of lubricant inside the part so that for all practical purposes it will never need lubrication during its lifetime. As soon as the part is subject to friction the resulting heat causes the oil to flow from the part and lubricate the two surfaces which caused the friction. When the movement stops and the area cools the oil is drawn back into the part through capillary action. This same process is repeated each time the part is used. (Tr. June 14, 1973, p. 162).

16. The defendant's vacuum impregnating tank was permanently hooked up by means of hoses to permanent oil storage tanks which contained various types of oils that were most commonly used.

When specialty oil such as Anderol 401D was called for, an auxiliary hose was used which ran directly to the drum containing the specialty oil. (Tr. June 14, 1973, p. 170).

17. The actual oil impregnation process involved the following steps:

(a) Lowering the parts in a basket into the vacuum tank;

(b) Drawing a vacuum in the tank;

(c) After the vacuum has been drawn, the valves to the oil tank are opened and the vacuum draws the oil into the tank through the bottom of the tank. The amount of oil introduced into the tank is determined by a sight gauge which permits the operator to see into the tank;

(d) When the tank is filled with the correct amount of oil, the oil valve is closed and approximately ten pounds PSI of positive air pressure is introduced into the tank;

(e) This air pressure forces the oil into the pores of the parts in the tank;

(f) After the parts have been under this pressure for approximately five minutes, the valves to the oil storage tanks are reopened and the air pressure forces the oil back into the holding tank passing through a filter on the way.

(g) The tank is opened and the basket containing the parts removed.

(Tr. June 14, 1973, p. 175).

18. After the parts are removed, they are poured out of the basket onto a metal drain table where excess oil is allowed to drain off the parts. (Tr. June 14, 1973, p. 167).

19. When the impregnating tank was opened after the impregnation process was completed, four to six parts were taken off the top of the materials in the basket and these were then sent to the Inspection Department to determine whether the parts had been impregnated

with adequate amounts of oil. (Tr. June 14, 1973, p. 208).

20. After the parts had been allowed to drain on the drain table, they were then placed in plastic bags inside cardboard cartons and sent to the shipping area for shipment to the customer. (Tr. June 14, 1973, p. 188).

21. The plastic bag in which the parts were placed was merely folded over and was in no way sealed. It was then put into the cardboard box and that box was sealed with tape. (Tr. June 14, 1973, p. 189).

22. The box was then stencilled for shipment and placed on a pallet in the shipping area to await the carrier. (Tr. June 14, 1973, p. 190).

23. The regular oils in more common use that were stored in the permanent storage tanks alongside the impregnating tank were heated by means of a gas heater so that the oil would travel through the lines faster and impregnate the parts faster. (Tr. June 14, 1973, p. 179).

24. These oils held in the permanent storage tanks were kept at temperatures anywhere from 130 to 180 degrees. (Tr. June 14, 1973, p. 256).

25. When parts were impregnated with the heated oil and then removed from the impregnating vessel the parts were hot and it should have been apparent to the operator that hot oil had been used in the impregnation. (Tr. June 14, 1973, p. 184).

26. The specialty oils, such as Anderol 401D, that were stored in their own container were not heated prior to impregnation and were used at room temperature. (Tr. June 14, 1973, p. 184).

27. In the early part of 1968, defendant was recommended to plaintiff by the United States as a qualified manufacturer of sleeve bearings fit for use in the M 904E2 bomb fuse. (Tr. March 8, 1973, p. 10).

28. Plaintiff requested and received samples of sleeve bearings from defendant before placing an initial order with defendant. (Tr. March 12, 1973, p. 12).

29. Plaintiff sent defendant its Purchase Order No. C 22641 dated May 3, 1968 (Exhibit 22), under which plaintiff agreed to buy and defendant agreed to sell 350,000 sleeve bearings intended for use by plaintiff in manufacturing bomb fuses for the United States Government and which were to be manufactured in accordance with military drawing B8839386 (Exhibit 3) and specifications MIL–L–6085 (Exhibit 7); MIL–B–5687C (Exhibit 6); and MIL–A–2550A (Exhibit 8) referenced on said drawing (Uncontested Statement of Facts Nos. 8–9; Tr. March 8, 1973, pp. 35, 38–39).

30. On May 14, 1968, defendant signed and returned to plaintiff the acknowledgment copy of plaintiff's Purchase Order No. C22641 dated May 3, 1968, agreeing to manufacture and ship bearings to plaintiff pursuant to said purchase order and in accordance with the military drawing and specifications referenced on said drawing which were in defendant's possession. (Exhibit 22; Tr. June 7, 1973, pp. 187–188).

31. Defendant accepted plaintiff's purchase order of May 3, 1968 with actual knowledge that plaintiff intended to use said bearings in the manufacture of the M 904E2 bomb fuse for use by the United States. (Tr. June 7, 1973, p. 118).

32. Pursuant to military specification, MIL–L–6085, the bearings were to be impregnated with oil which remained operable at temperatures as low as −70 degrees F. Defendant regularly used Anderol 401D, a synthetic oil manufactured by Tenneco during the time that it manufactured the bearings for the plaintiff because said oil conformed to the military specifications. (Tr. June 12, 1973, p. 3).

33. Between June 3, 1968 and September 3, 1968, defendant shipped to plaintiff 350,000 sleeve bearings pursuant to plaintiff's purchase order of May 3, 1968. (Defendant's answer to para-

graph 7 of the plaintiff's complaint; Tr. June 7, 1973, p. 118; Tr. June 12, 1973, pp. 40–41).

34. On March 6, 1969, plaintiff sent defendant its Purchase Order No. C 23385 (Exhibit 21) for an additional 165,000 sleeve bearings to be manufactured in accordance with military drawing B8839386 (Exhibit 3) and the aforesaid specifications referenced on said drawing. (Uncontested Statement of Facts No. 10; Tr. March 8, 1973, pp. 37–39).

35. On March 13, 1969, defendant signed and returned to plaintiff the acknowledgement copy of plaintiff's purchase order dated March 6, 1969, agreeing to manufacture and ship bearings to plaintiff pursuant to said purchase order and in accordance with the military drawing and specifications referenced on said drawing. (Uncontested Statement of Facts No. 11; Exhibit 21).

36. Defendant accepted plaintiff's Purchase Order No. C 23385 of March 6, 1969 with knowledge that plaintiff intended to use said bearings in the manufacture of the M 904E2 bomb fuse for use by the United States and that said sleeve bearings were to be of the same kind and quality and suitable for the purposes as sleeve bearings delivered by defendant to plaintiff prior to March, 1969. (Defendant's answer to paragraph 8 of plaintiff's complaint; Tr. June 12, 1973, p. 41).

37. Although the terms of plaintiff's Purchase Order No. C23385 called for delivery of 15,000 sleeve bearings weekly commencing March 24, 1969, the first shipment was not received until May 1, 1969. (Exhibit 21; Tr. March 9, 1973, p. 62; Tr. March 12, 1973, pp. 17–18; Tr. June 4, 1973, p. 72).

38. When plaintiff did not receive the first shipment of sleeve bearings pursuant to said purchase order, plaintiff called defendant in late April, 1969 and asked for an expedited shipment of sleeve bearings. (Tr. March 12, 1973, pp. 19–20, 27; Tr. June 4, 1973, pp. 35–36, 73–74).

39. Plaintiff had an inventory policy of first-in, first-out ("FIFO") as it related to sleeve bearings used in bomb fuses. (Tr. March 12, 1973, pp. 15–16, 19, 24).

40. Prior to receiving the May 1, 1969 shipment, plaintiff had no bearings in its plant. (Tr. March 8, 1973, pp. 119–120; Tr. March 9, 1973, p. 3; Tr. March 12, 1973, pp. 18–19, 24–25; Tr. June 4, 1973, pp. 34–35, 72, 75–76).

41. On May 1, 1969, plaintiff received 92,045 sleeve bearings from defendant in partial fulfillment of plaintiff's Purchase Order No. C 23385 dated March 6, 1969. (Uncontested Statement of Facts No. 12; Tr. March 12, 1973, p. 18).

42. The balance of the 165,000 parts ordered pursuant to the purchase order of March 6, 1969 were not shipped to the plaintiff until after May 19, 1969, the date that Lot 2–71 failed the Lot Acceptance Test. (Exhibit 21).

43. Defendant's Exhibit 34 is the record of the tests made by defendant following impregnation of the Lot of bearings received by the plaintiff on May 1, 1969, and shows that the bearings had been impregnated by oil from 23.2 percent to 26.8 percent by volume. (Exhibit 34; Tr. June 14, 1973, p. 210).

44. Exhibit 34, the record of oil inspection tests made on April 22, 1969, stated that the impregnating oil was Anderol 401D. (Exhibit 34, Tr. June 14, 1973, p. 213).

45. Pursuant to plaintiff's Purchase Order No. C 23385 of March 6, 1969, defendant furnished plaintiff with certificates of compliance (Exhibits 17 and 27) which certified that said sleeve bearings received by plaintiff on May 1, 1969 pursuant to said purchase order were produced in accordance with all requirements and military specifications including MIL–L–6085 (Exhibit 7), referred to in MIL–B–5687C Exhibit 6) and military drawing B8839386 (Exhibit 3). (Tr. March 8, 1973, pp. 42–43; Tr. March 9, 1973, p. 114; Tr. March 12,

1973, pp. 22–23; Tr. June 7, 1973, pp. 61, 86–87).

46. The purchase orders provided that all bearings sold by defendant to plaintiff would comply with the requirements of the United States as set forth in the military drawing and specifications referred to therein. (Tr. June 6, 1973, pp. 114–115).

47. The only inspection or test which plaintiff conducted on the sleeve bearings was a mechanical and visual inspection at the time of deliveries. This limited inspection was pursuant to Government imposed requirements. The Government did not require that the quality of the impregnating oil be checked. (Exhibit 9; Tr. March 9, 1973, pp. 113–114; Tr. June 6, 1973, pp. 131, 140, 143).

48. No defect was observed during plaintiff's limited inspection of the shipments of sleeve bearings received from defendant. (Exhibit 9).

49. The Government maintained full-time people on the premises of the plaintiff who were required to check certain critical components of the bomb fuse as they came into the plaintiff's plant. The sleeve bearings furnished by the defendant were not parts that were checked by the Defense Department personnel. (Tr. March 9, 1973, pp. 112–113).

50. On May 19, 1969, the United States rejected a lot of plaintiff's bomb fuses designated as Lot No. 2–71 (Exhibit 4.1) involving 14,976 bomb fuses. The Government impounded those bomb fuses together with 6,000 bomb fuses and 7,234 nose housing assemblies which made up Lot No. 2–72. (Tr. March 8, 1973, pp. 44, 98).

51. Lot 2–71 was submitted by Plaintiff to the United States Government, Department of Defense through its resident inspector at the plaintiff's plant, James Fitzpatrick. Lot 2–71 failed to pass the Government Acceptance Test because two fuses ran overtime in the cold phase of the test. (Tr. March 9, 1973, p. 123; Exhibit 4.1).

52. The size of the lots of bomb fuses to be submitted for acceptance was left up to the plaintiff. The plaintiff would advise the Government personnel what time span would be involved in making a particular lot. The Government Inspector would then select 72 fuses at specific time intervals during the production period. When the 72nd fuse had been selected, that particular Lot would end and be designated by a Lot number. The next fuse that came along the production line would be the first fuse in the next Lot. (Tr. March 9, 1973, p. 117).

53. The sample fuses selected by the Government were marked sequentially starting with 11 through 72 and these sample fuses were then kept in the control of the Government Inspector under lock and key until such time as the actual tests were conducted. (Tr. March 9, 1973, p. 118).

54. The Lot Acceptance Test normally took three days to complete. (Tr. March 9, 1973, p. 118).

55. One of the tests on the sample fuses determined arming time under simulated field conditions at various temperature levels. (Tr. March 9, 1973, p. 119).

56. This test was performed by dividing the 72 fuses into three groups of 24 each selected at random out of the test group. Twenty-four of these fuses were conditioned in a deep freeze to minus 65 degrees F. for 6 hours, another 24 were placed in an oven and conditioned to a temperature of 165 degrees F., and the remaining 24 were left at room temperature. (Tr. March 9, 1973, p. 119).

57. After the temperature conditioning was completed, all of the 72 fuses were tested in a wind tunnel and the time that they took to arm was recorded. (Tr. March 9, 1973, p. 120).

58. These fuses should have been capable of being set manually to arm at any point from 2 seconds to 18 seconds. (Tr. March 9, 1973, p. 120).

59. For test purposes there were 16 fuses in each temperature category set at 2 seconds and eight fuses were set at 18 seconds. The permissible tolerance was plus or minus ten percent. (Tr. March 9, 1973, p. 120).

60. A failure of any 2 fuses in any one of the three environmental tests resulted in rejection of the lot. (Tr. March 9, 1973, p. 123).

61. At the Lot Acceptance Test conducted on Lot 2–71 on May 19, 1969, two fuses failed to arm within the required time in the two-second, cold phase of the test; fuse No. 4 had a time of 3.03 seconds and fuse No. 24 had a time of 3.61 seconds. (See Exhibit 4.1).

62. At the request of the plaintiff, Mr. Louis Mueller, a Government inspector, arrived at the plaintiff's plant in the late morning of May 22 for the purpose of investigating the failure of Lot 2–71. (Tr. June 6, 1973, p. 35).

63. Mr. Mueller determined that oil found on the bearings delivered by defendant to plaintiff did not comply with military specifications. (Tr. June 4, 1973, p. 174; Tr. June 6, 1973, pp. 6–10, 16–21).

64. The United States Government representative assured himself that sleeve bearings tested by him came from the same source as sleeve bearings found in bomb fuses which made up Lot No. 2–71. (Tr. June 6, 1973, p. 5).

65. One of the tests conducted by Mr. Mueller in determining whether the oil on the bearings was defective was a pour point test at low temperature. He took a control sample of conforming oil, a sample of the oil from the plastic shipping bags, and a sample of oil from the assembly line bins. The three samples were chilled to a temperature of −65° F. Only the control sample remained in a fluid state. (Tr. June 6, 1973, pp. 16–17, 20–21).

66. Mr. Mueller found about ½ cup of oil in the bottom of at least one plastic shipping bag, and about ¼ cup of oil in the bin in which the bearings were kept beside the assembly line. The bearings in the bin and in the bags were oily to the touch. If the bearings had been impregnated with the proper oil, they would have been drier to the touch, and there would be little or no oil in the bottom of plastic shipping bags or in the assembly line bin. (Tr. June 6, 1973, pp. 123–124).

67. The non-conforming oil found in the shipping bags and in the bins was thick and dark, brownish-green in color. Conforming oil was light colored. (Tr. June 6, 1973, p. 124).

68. The non-conforming oil was visibly different from the conforming oil. The difference could have been observed by someone with experience in handling the sleeve bearings. (Tr. June 6, 1973, pp. 64, 126).

69. The non-conforming oil on the bearings constituted a patent defect which reasonably should have been discovered prior to incorporating the bearings in the bomb fuses.

70. As a result of the failure of Lot 2–71 to pass the Government's lot acceptance test, plaintiff suffered the following types of damages: cost of disassembling, reworking, and reassembly of the affected bomb fuses and nose housing assemblies; cost of fuses lost during the reworking procedure; cost of testing Lots 2–71A and 2–72A; cost of reimpregnating the sleeve bearings; and profits lost because of the interruption of the plant during the reworking procedures.

71. On or about May 22, 1969, Frederick Bond, plaintiff's purchasing agent, notified William Werner, defendant's assistant sales manager, by telephone, that plaintiff's bomb fuses had experienced field failures, and that the cause of the failures was contaminated oil on the sleeve bearings supplied by defendant. (Tr. June 14, 1973, p. 153).

72. No further information concerning the lot failure was furnished the defendant until a letter dated August 11, 1969, from plaintiff's Vice-President, Mr. Page, was received by defendant. The August 11, 1969 letter was sent in

response to defendant's request for information by letter dated July 28, 1969. (Tr. June 14, 1973, pp. 202–203; Exhibit 36B; Tr. June 14, 1973, p. 207; Exhibit 39; Tr. June 15, 1973, p. 30).

73. The letter of Mr. Page dated August 11, 1969 (Exhibit 39) was written approximately ten (10) days after reworked Lot 2–71, now 2–71A, was accepted by the Government and four (4) days after Lot 2–72A was accepted by the Government which was after all of the rework had been completed. (See Exhibit 4.2 and Exhibit 4.3).

74. From the date of the failure on May 19 to the date of the Page letter of August 11, other than the Bond telephone conversation on May 22, the plaintiff did not advise the defendant of the nature of the alleged problem, the extent of the alleged problem, the results of any alleged testing, the contemplated rework procedures, the projected cost of the contemplated rework procedures, and it did not furnish the defendant with any samples of the suspect bearings or give the defendant any opportunity to examine the failed fuses or the bearings in said fuses. (Tr. June 14, 1973, p. 203).

75. In September, 1969, plaintiff returned 17,410 sleeve bearings from the shipment of May 1, 1969 in their original containers to defendant. (Exhibit 38, Tr. March 9, 1973, pp. 19–20; Tr. March 12, 1973, p. 24; Tr. June 7, 1973, pp. 181–184; Tr. June 15, 1973, p. 115).

76. After plaintiff returned the 17,410 sleeve bearings, defendant did not test the oil on said sleeve bearings although defendant had been notified that the oil on these sleeve bearings was the wrong oil. (Tr. June 7, 1973, pp. 181–185).

## II. DISCUSSION

This action was brought by a buyer, General Instrument Corporation, F. W. Sickles Division, against a manufacturer and seller of sleeve bearings, Pennsylvania Pressed Metals, Inc., for breach of contract. The defendant's sleeve bearings were incorporated by plaintiff into bomb fuses manufactured by plaintiff for the United States Government. The case was tried without a jury.

■ Jurisdiction is founded upon 28 U.S.C. § 1332(a)(1).

Where, as here, a contract for sale of goods fails to designate as controlling the law of a particular jurisdiction, Pennsylvania law provides that the Pennsylvania Uniform Commercial Code shall apply to the transaction if there is "an appropriate relation to this state." 12A P.S. § 1–105. The defendant's plant is in Pennsylvania. The parties have briefed this case with reference to Pennsylvania law. The Court is convinced that the transaction in question bears a reasonable relation to Pennsylvania, and that Pennsylvania law is applicable.

### 1. *Liability for Breach of Contract.*

The defendant seller does not dispute that it expressly warranted that the sleeve bearings delivered to plaintiff on May 1, 1969 were manufactured in strict compliance with the applicable military specifications and, in particular, warranted that the bearings were impregnated with a light oil meeting military specification MIL–L–6085. The largest portion of the eleven-day trial was spent *in seeking to determine whether the* bearings were impregnated with, or had on their surface, non-conforming oil, and whether the failure of bomb fuse Lot 2–71 to pass the Government's Lot Acceptance Test was attributable to nonconforming oil in or on the bearings.

■ While stopping short of finding that the bearings in question were in fact impregnated with improper oil, the Court has determined that at least the oil found on the surface of the bearings and in the shipping bags was a dark, heavy oil which failed to meet specification MIL–L–6085, and that plaintiff received the bearings in this condition. Absent any explanation by defendant as to how the improper oil got on the bearings, the Court has determined that the

oil problem originated in defendant's plant. Based on these findings, the Court concludes that defendant breached its express warranty to supply bearings meeting the applicable specifications and its implied warranties of merchantability and fitness for a particular purpose. 12A P.S. §§ 2–313 to 2–315. In regards to the implied warranty of fitness for a particular purpose, the Court has found that defendant knew of the particular purpose for which the bearings were required, and that plaintiff relied on defendant's skill in furnishing suitable bearings. 12A P.S. § 2–315.

■ The defective bearings were delivered to defendant on May 1, 1969. Having accepted the bearings in question, the plaintiff was bound by the provisions of 12A P.S. § 2–607(3)(a) which provides that

> "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy . . ."

On May 22, 1969, the plaintiff notified defendant that there were bomb fuse failures caused by contaminated oil on the sleeve bearings supplied by defendant. In form, this oral communication constituted sufficient notice under 12A P.S. § 2–607(3)(a), since the notice "need only be such as informs the seller that the transaction is claimed to involve a breach . . . ." 12A P.S. §§ 2–607, Comment 4. There remains the question of whether the notice, given on the day the defect was in fact discovered, was timely. Defendant contends that the defect was obvious, that it should have been discovered upon receipt of the bearings on May 1, 1969, and that the three-week delay in the giving of notice of the breach rendered it untimely. In my view, the obviousness of the defect and the consequences of failing to discover it prior to incorporating the bearings in the bomb fuses are factors more appropriate in the determination as to whether plaintiff is entitled to incidental and consequential damages under

12A P.S. § 2–715. As discussed below, the Court has concluded that the improper oil should have been discovered before the bearings were put into the fuses. However, on the question of normal breach of warranty damages as provided by 12A P.S. § 2–714, the notice of breach given shortly after the defect should have been discovered was within a "reasonable time" as required by 12A P.S. § 2–607(3)(a).

## 2. *Damages.*

The normal measure of damages for breach of warranty is the difference between the value of the goods accepted and the value they would have had if they had been as warranted. 12A P.S. § 2–714(2). The value of the 92,000 bearings received on May 1, 1969 was practically zero because of the non-conforming oil. The value of the bearings as warranted was less than $2,000.00. However, plaintiff makes no claim for this difference in value because it never paid defendant for the faulty bearings. Plaintiff's sole claim is for incidental and consequential damages.

The award of incidental and consequential damages for breach of contract is not automatic. 12A P.S. § 2–714(3) provides that "[i]n a proper case any incidental and consequential damages under the next section may also be recovered." The next section, 12A P.S. § 2–715, provides in full:

> "(1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.
>
> "(2) Consequential damages resulting from the seller's breach include
>
> (a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know

and which could not reasonably be prevented by cover or otherwise; and

(b) injury to person or property proximately resulting from any breach of warranty."

The plaintiff claims a total of $231,509.67 in incidental and consequential damages.[1] It should be noted that all of these alleged damages arose as a result of installing the defective bearings in the bomb fuses, the subsequent failure of bomb fuse Lot 2–71 to pass the government's lot acceptance test, and the required reworking of Lots 2–71 and 2–72. The alleged incidental expenses include disassembling, reworking, and reassembly of the affected bomb fuses and nose housing assemblies, fuses lost during the reworking procedure, the cost of testing Lots 2–71A and 2–72A, and cost of reimpregnating the sleeve bearings. Plaintiff's claimed consequential damages are comprised of profits lost because of interruption of the plant during the reworking procedures.

It is the Court's duty to determine whether this is a "proper case" in which to award incidental and consequential damages. The defendant contends that it is not, because the presence of the nonconforming oil on the bearings was a patent defect which the plaintiff unreasonably failed to discover. The plaintiff argues that its inspection procedures were reasonable and adequate, and that the defect was latent. A detailed review of the factual situation surrounding this issue is in order.

Sleeve bearings were normally shipped by defendant to plaintiff's plant in plastic bags within cardboard boxes one cubic foot in size. Upon receipt of a shipment, plaintiff's inspectors opened the boxes and measured a few of the bearings on top in order to determine whether they met dimensional specifications. The plastic bags were not lifted from the boxes. No inspection, either visual

or physical, was ever made of the impregnating oil, because under normal circumstances the oil would have to be extracted from the bearings to be examined. The seller's certificate of compliance with the military specifications was deemed an adequate assurance that the oil conformed with those specifications. This limited inspection procedure met the Government's requirements concerning the extent and method of sleeve bearing inspection.

Following the initial inspection, the boxes containing the sleeve bearings were transferred to the storage room. As needed, the bearings were taken to the assembly line and dumped into a small bin from which the assembly line worker would remove the bearings to insert them into the nose housing assemblies of the bomb fuses.

Bearings which had been impregnated with the proper oil had very little oil on the surface of the bearings, and practically none of the conforming light-colored oil would be found in the bottom of the plastic shipping bags or in the assembly line bin. In contrast, the bearings which are the subject of this case were obviously oily to the touch and in the bottom of each of the plastic shipping bags there was a one-and-one-half-inch accumulation of non-conforming oil, about one-half cup. The assembly line bin containing the defective bearings also contained a noticeable accumulation of the non-conforming oil. The oil, unlike oil meeting the military specification, was a dark, brownish-green color, somewhat like crankcase oil.

Mr. Louis Mueller, the Government inspector who was sent to plaintiff's plant to determine the cause of failure of bomb fuse Lot 2–71, was the first person to discover the non-conforming oil in the shipping bags and in the assembly line bin. He testified that the difference in the oils was noticeable to someone experienced in the field, but he

1. The Court has made no findings as to what damages plaintiff in fact sustained because of its ultimate conclusion that plaintiff is not entitled to any incidental or consequential damages.

did not feel that plaintiff's initial inspectors would have discovered the defect because they were only required to check the dimensional specifications of in-coming bearings. Nor did Mr. Mueller think that the average assembly-line worker would discover the noticeable difference in the oil. In this regard, the following exchange took place between the Court and Mr. Mueller (Transcript of June 6, 1973, at pp. 126–27):

"THE COURT: Now, if there was a larger quantity of oil, a much larger quantity I believe you testified, in the bottom of these bags and of a different color than would have been normally anticipated, why wouldn't the ordinary operator who had the duty of putting the bearings in the bin have noticed that?

"MR. MUELLER: I really don't know, sir, other than to say that in my experience along these lines . . . operators frequently were somewhat—I cannot properly say careless—they were let me say unconcerned very frequently about the appearance of the parts. It took an unusually astute and concerned operator to notice things that were not correct. That was my experience."

■ In my view, the non-conforming oil was an obvious defect which should have been discovered by plaintiff before the bearings were incorporated into the bomb fuses. Discovery of the defect would have been simple. A mere visual inspection of the whole contents of the bag would at least have put anyone who regularly handled these bearings on notice that something was amiss. A subsequent test, such as a simple low temperature pour point test, would indicate that the oil did not meet the military specifications and that the bearings should not be incorporated into the fuses without remedial measures. Perhaps, as plaintiff contends, the initial, limited inspection was reasonable in light of the Government's approval of that procedure. But that does not alter the fact that the defect should have been discovered at some time during the manufacturing process prior to incorporation of the bearings in the fuses. If assembly-line workers were "unconcerned" about the appearance of the parts that they were handling, then additional inspection procedures, perhaps during the assembly process, should have been instituted. Failing such procedures, the workers' "unconcern" must be imputed to the plaintiff. Prior to May, 1969, plaintiff had received and handled approximately 1,500,000 properly impregnated bearings. A frequent buyer of a particular product must be held to a higher standard in discovering defects in that particular product than a casual buyer. Cf. 12A P.S. § 2–316, Comment 8. Under all the circumstances, I find that the non-conforming oil on the sleeve bearings constituted a patent defect, and that plaintiff's failure to discover the defect was unreasonable.

■ It remains to determine the consequences of this finding. 12A P.S. § 2–715 provides for incidental and consequential damages "resulting from the seller's breach." The "resulting from" language is the equivalent of stating that the damages must be proximately caused by the breach. Comment 13 to 12A P.S. § 2–314 provides:

"In an action based on breach of warranty, it is of course necessary to show not only the existence of the warranty but the fact that the warranty was broken and that the breach of the warranty was the proximate cause of the loss sustained. In such an action an affirmative showing by the seller that the loss resulted from some action or event following his own delivery of the goods can operate as a defense. . . . Action by the buyer following an examination of the goods which ought to have indicated the defect complained of can be shown as matter bearing on whether the breach · itself was the cause of the injury."

12A P.S. § 2–715(2)(b) provides that recoverable consequential damages include "injury to person or property

proximately resulting from any breach of warranty." Comment 5 of 12A P.S. § 2–715 gives an illustration of proximate cause in this context:

". . . Where the injury involved follows the use of goods without discovery of the defect causing the damage, the question of 'proximate' cause turns on whether it was reasonable for the buyer to use the goods without such inspection as would have revealed the defects. If it was not reasonable for him to do so, or if he did in fact discover the defect prior to his use, the injury would not proximately result from the breach of warranty."

The above illustration is equally applicable to the general requirement that incidental and consequential damages must result from, or be proximately caused by, the breach of warranty. Pennsylvania case law is in accord with the position that incidental and consequential damages are limited to losses proximately caused by the breach of warranty, and that proximate cause is lacking where the buyer unreasonably failed to discover obvious defects in the goods. See Griffin v. Metal Product Co., 264 Pa. 254, 107 A. 713 (1919) (Sales Act case); Budd v. Mutchler, 98 Pa.Super. 420, 423 (1930) (Sales Act case); Powell v. Scottdale Machine, Foundry and Construction Co., 26 Fal.L.J. 167 (1964) (Uniform Commercial Code case).

The incidental and consequential damages suffered by plaintiff were not proximately caused by defendant's breach of warranty because the plaintiff unreasonably failed to discover the patent defect in the sleeve bearings.

### III. CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties and the subject matter.

2. The provisions of Article 2 of the Uniform Commercial Code, 12A P.S. § 2–101 et seq., are applicable to the transaction in question.

3. Defendant breached its express warranty and implied warranties of merchantability and fitness for a partic-

ular purpose by selling to plaintiff sleeve bearings coated with improper oil.

4. The incidental and consequential damages suffered by plaintiff were not proximately caused by defendant's breach of warranty.

5. Costs will be borne by the plaintiff.

An Order directing the Clerk to enter judgment in favor of defendant, together with costs, will be entered.