R. I. Lampus Co. *v.* Neville Cement Products Corporation, Appellant.

Argued November 14, 1974. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*Robert W. Doty,* with him *Peter C. Baggerman,* and *Eckert, Seamans, Cherin & Mellott,* for appellant.

*William A. Johnson,* with him *Melvin Schwartz,* and *Cooper, Schwartz, Diamond & Reich,* for appellee.

OPINION BY HOFFMAN, J., March 31, 1975:

The appellee, R. I. Lampus Company ("Lampus") instituted suit against the appellant, Neville Cement Products Corporation ("Neville"), alleging that Neville had failed to pay for products it had purchased from Lampus. Neville filed a counterclaim, alleging that it had incurred damages because the goods delivered by Lampus were defective. Neville sought ten items of damages for Lampus's alleged breach of express and implied warranties, but the lower court awarded recovery on only four of the claims. It is the denial of the remaining six damage claims of Neville's counterclaim that is the subject of this appeal.

Neville is principally engaged in the production of structural floor and ceiling systems. The manufacturing process begins with concrete block units. Neville would grind the end of the blocks, assemble the blocks end to end to form a plank, place reinforcing rods and

a prestressing cable through the holes in the blocks and would then cure the completed plank. The planks produced by Neville were fitted together to form the floor and ceiling systems in various kinds of structures, such as apartments, motels, office buildings and industrial buildings.

Prior to 1963, Neville manufactured the concrete block units which it incorporated into the floor and ceiling systems. In 1963, Lampus, a corporation engaged in the manufacture, sale, and delivery of concrete masonry units, was informed by a mutual acquaintance that Neville might be interested in purchasing the concrete blocks from an outside firm. After several preliminary meetings, the parties agreed that Lampus would produce concrete blocks for delivery to Neville. Donald Lampus, the appellee's Treasurer and General Manager, testified that he was under the impression that Lampus would act as Neville's sole supplier, but the parties never entered into an "output" or "requirements" contract. The procedure used throughout the existence of their business relationship (1963-1970) was for Neville to submit purchase orders for various quantities of block. Lampus would accept each offer and produce the units.[1]

At the preliminary meetings, Neville instructed Lampus as to the specifications it required for its concrete block units. Neville's specifications regarding strength, dimensions, texture , and appearance were those generally prevailing in the industry. In addition, Neville supplied Lampus with the mold equipment. Donald Lampus testified that he was aware that the blocks Lampus was to manufacture would be incorpo-

---

[1] That the parties never had a long-term contract is made clear by Lampus's failure to make any breach of contract claims as a result of Neville's unilateral termination of their business relationship in 1970.

rated into Neville's structural systems, that the systems would either be covered in some manner or left exposed, that the majority of the ceiling surfaces would be painted, that the blocks would have to be relatively free from chips and cracks, and the blocks could not have a slumped or warped face. Lampus produced samples of the units for Neville's approval before production orders were submitted.

From 1963 until the middle of 1967, Lampus manufactured a concrete block unit known as "Dox". Although some of the block was rejected on occasion, no unusual difficulties arose during this period. In 1967, however, Neville directed Lampus to begin production of a "Celdex" block unit. As it had done with the Dox unit, Neville supplied the mold box and specified the ingredients and particular physical properties it required. Eventually, Dox production was phased out and Lampus produced only Celdex units for Neville. Donald Lampus conceded at trial that the quality of the Celdex block was unsatisfactory during the initial period of production. On July 31, 1968, Neville informed Lampus by letter of various losses it had incurred as a result of the Celdex blocks' failure to meet specifications.[2] The total damages claimed were $51,990.24. In response to this letter, Lampus gave Neville a $25,000 credit for "Defective Material" on its August 15, 1968 invoice. Donald Lampus explained the appellee's reasoning: "Q. Was the credit shown . . . given at least in part for the reason that you did not feel Neville should have to stand any substantial problems that you

---

[2] Neville claimed the following items of loss: (1) rejected block; (2) loss of plant time due to block destroyed on production line; (3) block destroyed on production line; (4) costs to clean up the broken block; (5) cost to replace rejected plank at job sites; (6) extra crew time at job sites due to rejected plank; (7) extra paint required on ceilings; and (8) excess costs for pointing and caulking ceilings.

had in the manufacture of block? A. This was in the inception of our manufacture of Celdex at our plant. This was at the time we realized we had some problems, yes." Mr. Lampus further testified that his company felt that it had "reasonably resolved" its problems by August 15, 1968.

Both Mr. Lampus and Mr. Hensel, President of Neville, testified that the parties continued to have meetings after August 15, 1968. Mr. Lampus claimed that Neville never suggested that Lampus was delivering unusual quantities of defective block: ". . . At almost every meeting they would point out that the texture of this particular block was a little coarse[r] than what they would like to have, . . . or we've got a block that has a chip on it, or something along that line. They were, in fact, not any more pressing the problems than they had from, let's say, '63 through '67." Neville's evidence emphatically denies the accuracy of Mr. Lampus's version of the events. Mr. Hensel testified that the Lampus representatives were shown samples of rejected block and that they were taken to a job site and shown an installed ceiling which had a defective appearance. According to Mr. Henzel, the Lampus people acknowledged the difficulties but indicated that the problems could be corrected. Charles Lanza, Neville's Vice-President for Operations, gave a similar account of the 1968 and 1969 meetings between the parties. The following testimony of George Duve, Neville's General Sales Manager, is representative of Neville's position: "Q. At these meetings were samples of the block containing the defects you have described pointed out to the representatives of R. I. Lampus Company? A. Yes. Q. Would you describe what they said or did when these defects were pointed out to them? A. Well, I found mostly a standard term that I commented on many times was, yes, we know what's causing these. We know what problem this is. We know how to rectify this. I

found that in no case did we ever baffle them with any problem that they didn't seem aware of or couldn't rectify both in the yard and in the plant. . . . Q. In addition to the samples of block that you pointed out to the R. I. Lampus Company representatives at these meetings, did you, also, call to their attention piles or quantities of block that had been rejected? A. Yes, sir, directly outside of our door where we had segregated into various groups why these block were rejected. . . ."

No formal written demand for damages or credits was made after the July 31, 1968, letter until July 15, 1970, when Neville informed Lampus that it was claiming $112,000 in damages as a result of Lampus's alleged breach of warranties. Following receipt of this letter, Lampus instituted suit to collect the amount due and owing on Neville's account. The lower court upheld $80,464.36 of Lampus's claim. On Neville's counterclaim, the court awarded recovery on four items totalling $42,046.05, characterizing them as "direct damages for breach of warranty": (1) blocks rejected on the production line; (2) defective block in Neville's inventory; (3) structural floor systems destroyed ("blown up") during production; and (4) loss of plant time resulting from the systems "blown up". The court held that there was sufficient evidence of record "to show the existence of express and implied warranties, the fact that they were breached by Lampus, and that such breaches were the proximate cause of the direct damage sustained by Neville." The court denied recovery on the remaining six items of Neville's counterclaim "because of insufficient evidence to indicate that Neville communicated to Lampus at the time of entering into the contract sufficient facts to make it apparent that the damages subsequently claimed were within the reasonable contemplation of the parties." These damages consisted of: (1) blocks rejected after production,

i.e., finished floor systems that could not be delivered to Neville's customers; (2) cost of disposing of defective blocks and floor systems; (3) cost of hiring additional personnel to inspect and handle the broken and rejected block; (4) costs incurred because Neville's customers rejected the floor systems, not including delivery costs or lost profits; (5) costs incurred to place special covers on defective ceilings; and (6) costs incurred to point and caulk the defective ceilings.

This opinion contains two sections. The first will discuss the legal principles applicable to the present case; the second section concerns the propriety of the trial court's ruling in light of those principles.

## I.

The sole issue presented on appeal is whether the trial court erred in denying recovery on the six items of Neville's counterclaim listed above. Normally, when a buyer has accepted goods and claims damages resulting from the seller's breach of warranty,[3] his damages are measured by the "difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, *unless special circumstances show proximate damages of a different amount.*" Uniform Commercial Code, 12A P.S. §2-714(2). (Emphasis added.)[4] In a "proper" case, consequential damages may also be recovered. 12A P.S. §2-714(3). Buyer's incidental and consequential damages are recoverable under §2-715. Although the Code never specifically defines "conse-

---

[3] The buyer has the option of either instituting his own action or using the damages as a set-off in the seller's action for the purchase price. *National Container Corp. v. Regal Corrugated Box Co.*, 383 Pa. 499, 119 A. 2d 270 (1956); 12A P.S. §2-717.

[4] Law of April 6, 1953, P.L. 3; reenacted as Law of October 2, 1960, P.L. 1023, 12A P.S. §2-714(2).

quential" damages, it states that they include "(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise. . . ." 12A P.S. §2-715 (2)(a). Neville's claim must be viewed against the background of these two controlling provisions of the Uniform Commercial Code.

The leading Pennsylvania case on this issue, and the only decision cited by the lower court in support of its ruling, is *Keystone Diesel Engine Co., Inc. v. Irwin,* 411 Pa. 222, 191 A. 2d 376 (1963). In *Keystone,* a contract carrier operating tractor-trailers counterclaimed for lost profits against the seller of a defective diesel engine. The buyer's claim was premised on the fact that he was unable to use a tractor-trailer for twenty-seven days because the engine supplied by the plaintiff failed to function properly, in breach of the seller's implied warranty of merchantability. The Court stated that when a contract is breached without legal justification, the injured party can recover any damages he suffered, if (1) they were such as would naturally and ordinarily follow from the breach; (2) they can be proved with reasonable certainty; and (3) they were reasonably foreseeable and within the contemplation of the parties at the time the contract was entered into. The Court struck off the buyer's counterclaim because the third element was not met: "In the case at bar, no facts are alleged that would put the plaintiff on guard to the fact that the defendant would hold the plaintiff responsible for any loss of profit arising from the inability to use the engine in question." 411 Pa. at 225-226, 191 A. 2d at 379. The difficulty with *Keystone* is not the result reached. Rather, confusion may arise because of the manner in which the Court interpreted the applicable provisions of the Code.

While we agree with the lower court that the instant case is controlled by *Keystone,* we disagree with its application of *Keystone* to the factual situation presented. Before discussing this application, however, certain difficulties faced by courts and commentators in interpreting *Keystone* in light of the Code provisions should be noted.

After setting forth §§2-714(2), 2-714(3), and 2-715 (2)(a), the Court proceeded to define the "special circumstances" referred to in §2-714(2) : " 'Special circumstances' entitling the buyer to damages in excess of the difference between the values as warranted and the value as accepted exist where the buyer has communicated to the seller at the time of entering into the contract sufficient facts to make it apparent that the damages subsequently claimed were within the reasonable contemplation of the parties." 411 Pa. at 225, 191 A. 2d at 378. Apparently, the Court held that because there were no "facts" alleged that would have put the seller on notice of the buyer's intention to hold it responsible for lost profits, there were no "special circumstances" and thus no recovery beyond the usual contract measure of damages for breach of warranty— the difference between the value of the goods as warranted and as accepted. Accordingly, one commentator has stated : "If the buyer can establish special circumstances, he may also recover incidental and consequential damages." Comment, *Loss of Goodwill and Business Reputation as Recoverable Elements of Damages Under Uniform Commercial Code §2-715—The Pennsylvania Experience,* 75 Dick. L. Rev. 63, 65 (1970). Similarly, our Court has recently stated that the contract measure of damages is the normal rule for breach of warranty, "[b]ut special circumstances showing proximate damages of a different amount will alter the rule, permitting incidental and consequential damages

to be recovered in a proper case." *Wisniewski v. Great Atlantic and Pacific Tea Co.*, 226 Pa. Superior Ct. 574, 580, 323 A. 2d 744, 747 (1974).

One difficulty is that the *Keystone* opinion does no more than set forth §2-715(2)(a), thus making it less than certain that the "special circumstances" test was intended to apply to the section on consequential damages, as well as to §2-714(2). The following comment is instructive: "In Keystone, . . . the court was faced with a problem reminiscent of the landmark case of Hadley v. Baxendale [9 Ex. 341, 156 Eng. Rep. 145 (1854)]. Its discussion of section 2-714(2) of the Code, regarding buyer's damages for breach in regard to accepted goods, was unobjectionable. However, its failure to mention section 2-715(2), regarding buyer's consequential damages, leaves a residue of confusion in the application of the basic 'contemplation' test in contracts for the sale of goods." Holahan and Murray, *Commercial Transactions*, 1956-1965 Decennial Survey of Pennsylvania Law, 27 U. Pitt. L. Rev. 185, 334 (1966).

Another difficulty is a possible conflict between *Keystone's* definition of "special circumstances" and the statutory language of §2-715(2)(a). Under that provision, consequential damages include any loss resulting from the buyer's needs or requirements "of which the seller at the time of contracting *had reason to know.*" (Emphasis added.) Comment 2 to §2-715 states that "[t]he 'tacit agreement' test for the recovery of consequential damages is rejected," and Comment 3 states that "[i]t is not necessary that there be a conscious acceptance of an insurer's liability on the seller's part. . . ." On the other hand, the definition of "special circumstances" as the communication from buyer to seller of "sufficient facts to make it apparent that the damages subsequently claimed were within the

reasonable contemplation of the parties," may require an agreement of some form. Thus, if "special circumstances" is a prerequisite to the recovery of consequential damages, the Court may have limited the scope of §2-715(2)'s award of damages for any loss resulting from needs of the buyer of which the seller "had reason to know." In *Jones & McKnight Corp. v. Birdsboro Corp.*, 320 F. Supp. 39 (N.D. Ill. 1970), the court, applying Pennsylvania law, construed *Keystone* as requiring a tacit agreement that consequential damages would be recoverable. In *Adams v. J. I. Case Co.*, 261 N.E. 2d 1 (Ill. App. 1970), the court held that §2-715 should not be so narrowly construed as to require a prior understanding or agreement that the seller would be bound for consequential damages in the event of his breach, and that if *Keystone* so held it must be rejected. See also *Beal v. General Motors Corp.*, 354 F. Supp. 423 (D. Del. 1973). As discussed below, however, the damages in the present case were within the contemplation of the parties, and thus the result will remain the same regardless of which viewpoint is adopted.

The result in *Keystone* is certainly consistent with the posture taken by our Supreme Court because of the fact that §2-715(2) authorizes recovery for "any loss." For example, *Harry Rubin & Sons, Inc. v. Consolidated Pipe Co. of America, Inc.*, 396 Pa. 506, 153 A. 2d 472 (1959), held that a buyer's loss of good will is too speculative to be recovered under §2-715.[5] See also

---

[5] The rationale of *Rubin* has not gone without criticism. "The most noteworthy feature of [*Rubin*] is the court's conclusion that the Code was not intended to enlarge the scope of damages . . . . The *Rubin* result may well be desirable, for an overly rapid expansion of relief particularly for consequential losses may unduly increase the scope of risk to be assumed by the parties to a contract for the sale of goods. Yet as a reading of the intent of the draftsmen of the Code, *Rubin* is surely wrong. The Code is dedicated to the expansion of all damages, of all kinds, yet such ex-

*Kassab v. Central Soya*, 432 Pa. 217, 237, n. 12, 246 A. 2d 848, 857, n. 12 (1968). The result in *Keystone,* however, could have been reached entirely within the framework of §2-715.[6] While it is to be hoped that our Supreme Court will soon clarify to the extent possible what is a "proper" case for consequential damages, the issue presented in the instant case can be decided within the language of *Keystone* and the "special circumstances" cases decided under the now-repealed Sales Act.[7]

## II.

It now must be determined whether the lower court correctly applied the *Keystone* tests to the facts of this case. The types of losses claimed by Neville are clearly those which would naturally and ordinarily flow from Lampus's breach, and Neville proved those damages with reasonable certainty. Thus, the issue is reduced to

---

pansion cannot take place without an orderly and consistent framework within which to develop." Peters, Remedies for Breach of Contracts Relating to the Sale of Goods under the Uniform Commercial Code: A Roadmap for Article Two, 73 Yale L.J. 199, 277 (1963) ; see also *Neville Chemical Co. v. Union Carbide Corp.*, 422 F. 2d 1205 (3d Cir. 1970), cert. denied, 400 U.S. 826 ; Comment, Loss of Goodwill and Business Reputation as Recoverable Elements of Damages under Uniform Commercial Code §2-715—The Pennsylvania Experience, supra.

[6] Had the Court in *Keystone* held the buyer's lost profits to be a properly recoverable item of consequential damages, it could have denied recovery because the lost profits were not "any loss . . . which could not reasonably be prevented by cover or otherwise." The Court could have held that the buyer acted unreasonably in not conducting a portion of his business because the engine supplied by the plaintiff was not functioning properly. If the buyer could not have "covered" it was certainly possible for him to rent another truck, and charge that expense to the seller, instead of attempting to recover lost profits. See discussion, infra.

[7] 1915, May 19, P.L. 543, §69, 69 P.S. §314.

a consideration of whether Neville has met the "special circumstances" test. In *Wolstenholme, Inc. v. Joseph Randall & Bro., Inc.*, 295 Pa. 131, 144 A. 909 (1929), the seller and the buyer entered into a contract for the sale of silk. The seller was aware of the purpose for which the silk would be used and the requirements of the buyer's customers, and was expressly informed that a variation in quality or grade would result in serious damage to the finished cloth. The Court held that the requirements as to special circumstances had been fulfilled. Similarly, this Court held that special circumstances were present when the seller of wrapping paper knew that his buyer would use the paper to cover its customers' boxes. *Royal Pioneer Paper Box Mfg. Co., Inc. v. DeJonge*, 179 Pa. Superior Ct. 155, 115 A. 2d 837 (1955). In the present case, Lampus knew exactly what end use would be made of the blocks it manufactured. Furthermore, the damages Neville had claimed in its letter of July 31, 1968, were virtually identical to the damages claimed at trial. The fact that Neville made no formal demands for damages and/or credits from July 31, 1968, until July 15, 1970, has no bearing on the extent of Lampus' knowledge that Neville intended to hold it responsible for these kinds of damages. The following excerpt from the testimony of Donald Lampus is indicative of Neville's position: "Q. Did you understand that this letter [July 31, 1968], . . . contained a summary of the losses which Neville believed it had incurred because Celdex blocks furnished by Lampus failed to meet specifications? Did you understand that that was the subject matter of that letter? A. I believe, that's what they proposed, yes. . . . Q. Mr. Lampus, was it your understanding that if defective block were shipped by your Company to Neville that the types of losses set forth in this letter dated July 31, 1968, could result? A. Yes." The frequent meetings between the parties, and Lampus's visit to at least one

Neville job site, make it clear that Lampus knew Neville would seek damages. Perhaps the lower court was concerned with the requirement that the seller's knowledge be gauged "at the time of contract." As stated previously, there was no single contract between the parties—theirs was a continuing, on-going relationship. If Lampus was unaware that Neville would seek damages for these losses in 1963, it certainly cannot make that argument after it received Neville's letter of July 31, 1968. It should be noted that all the losses alleged by Neville occurred after that date. Furthermore, the kinds of losses Neville suffered must be stressed. There are no claims for lost profits or loss of business reputation; Neville's claims all concern out-of-pocket costs made necessary by Lampus's breach. Thus, the record supports Neville's claim that these six items of damages were within the contemplation of the parties at the time of contract.

Lampus makes two further arguments in support of the holding of the trial court. Because the court denied Neville's claim on the basis of *Keystone,* it did not consider these contentions. First, Lampus contends that Neville never complied with §2-607(3)(a), which provides that where a tender has been accepted, "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy. . . ." Comment 4 is crucial: "The content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched. There is no reason to require that the notification which saves the buyer's rights under this section must include a clear statement of all the objections that will be relied on by the buyer, . . . . Nor is there any reason for requiring the notification to be a claim for damages or of any threatened litigation or other resort to a remedy." While Neville never made any formal de-

mands, these are not required by the Code. The record is clear that many meetings between the parties took place during the years in question, and that Neville's dissatisfactions with the concrete blocks were expressed to Lampus and acknowledged. Furthermore, the trial judge awarded damages to Neville on four of its claims. Had Neville not given the proper notice, it would have been barred from *any* remedy. In *Babcock Poultry Farm, Inc. v. Shook*, 204 Pa. Superior Ct. 141, 203 A. 2d 399 (1964), our Court stated: "On the question of notice of the breach, the jury could infer that Babcock was aware that its warranty was breached through the periodic reports required to be submitted to it by Shook. . . ." 204 Pa. Superior Ct. at 144, 203 A. 2d at 401. The evidence presented at trial was ample to show that Neville informed Lampus of the breaches committed.

Lampus's second contention is that Neville is not entitled to consequential damages because the losses suffered "could have been prevented by cover or otherwise." Comment 2 to §2-715 explains this requirement: "Although the older rule at common law which made the seller liable for all consequential damages of which he had 'reason to know' in advance is followed, the liberality of that rule is modified by refusing to permit recovery unless the buyer could not reasonably have prevented the loss by cover or otherwise." This rule is similar to the doctrine applied generally in contract law: "Damages are not recoverable for harm that the plaintiff should have foreseen and could have avoided by reasonable effort without undue risk, expense, or humiliation." Restatement, Contracts, §336; *see also Jarnot v. Ford Motor Co.*, 191 Pa. Superior Ct. 422, 156 A. 2d 568 (1959). The rule requiring the buyer to mitigate damages in good faith is another way of saying that a buyer can recover only for those losses proximately caused by the seller's breach of warranty. Thus,

Comment 13 to §2-314 states in part: "Action by the buyer following an examination of the goods which ought to have indicated the defect complained of can be shown as matter bearing on whether the breach itself was the cause of the injury." *See also General Inst. Corp. v. Pennsylvania Pressed Metals, Inc.*, 366 F. Supp. 139 (M.D. Pa. 1973). It is necessary, therefore, to examine the inspection procedures employed by Neville in order to determine whether any of the losses claimed could have reasonably been prevented.

The blocks produced by Lampus were delivered to Neville in the form of strapped "cubes". Neville first inspected each cube when it was brought from the yard into the plant. Each cube was then disassembled and the individual blocks were visually inspected as they entered the manufacturing process. A Neville employee would cut the banding on the cube and place the individual blocks on a power conveyor. That employee would segregate any block which he considered defective. After the block went through the grinding procedure, it was re-inspected to check the accuracy of the grinds, the tolerances on the grind, and to detect any flaws that may have occurred in the grinding procedure, such as the appearance of cracks that were not apparent at the initial visual inspection. Mr. Hensel testified that Neville was concerned only with structural defects: "Our main concern was to screen those block for those items that could not or would in all probability prevent a plank from being successfully stressed." All blocks that were structurally able to withstand Neville's prestressing operation were kept in the manufacturing process. Consistent with this policy, all planks formed from the blocks which were structurally sound were delivered to Neville's various job sites. If a structurally unsound plank was sent to the job site, it would be rejected there. The following testimony by

Mr. Hensel is the crux of Lampus's contention: "Q. Because of this inspection program and the policy of your Company that they would pass blocks along as it were structurally sufficient, R. I. Lampus Company was not notified when block that you considered or that you thought your customer might consider of questionable appearance or texture, the R. I. Lampus Company was not notified that we've got fifty block here of questionable appearance here, were they? A. I do not think we notified them for every quantity we arrived at, but we certainly notified them that we would like to have meetings over these matters. Q. Well, when you received block of questionable appearance or texture, and if they withstood your prestressing operation and were formed into plank that were structurally sound but perhaps allegedly of questionable appearance, these were passed on and went on to the job, were they not? A. It was not practical to inspect these block until such time as they were used because they were coming in too fast. . . . Q. Well, for instance, you've got a bad block, you've got one individual bad unit. Now, at this point, if you cut it out, you lose anywhere between thirty-eight or fifty-eight cents. . . . Once that block is assembled in the plank, then you have, I don't know, a hundred dollars, several hundred dollars invested in a plank? A. Yes. Certain plank's [sic] vary in you're getting up in money. Q. This plank is transported to the job, you've got hauling costs, you've got expense in loading; and the plank is placed in a building, you've got erection costs, you've got all your labor costs out there, and then you determine the block is bad. You're talking about several thousand dollars or a thousand dollars or several hundred to take a plank back out? A. We thought it behooved us to use every possible one of these block that we could because—Well, I don't know if you want a further explanation. That's my answer to that question."

The six items of damages claimed by Neville must be examined against this testimony to determine whether the losses suffered could reasonably have been prevented within the meaning of §2-715(2)(a). To repeat, Neville claimed damages for: (1) blocks rejected after they had been formed into planks but prior to delivery to the job sites; (2) the expenses incurred by Neville in disposing of defective blocks and floor systems; (3) the cost of employing additional personnel to inspect and handle the broken and rejected block; (4) the costs of finished systems which were rejected by Neville's customers at certain job sites; (5) the expense of placing special covers on certain ceilings installed into buildings; and (6) the expenses incurred for excess pointing and caulking required on certain ceilings.

The first item concerns blocks that were formed into planks but were determined by Neville to be unfit for use on a job site. There is nothing in the record to indicate that these blocks had patent defects which should have alerted Neville to discontinue its manufacturing process at any earlier point. As the testimony quoted above indicates, Neville was mainly concerned with the structural soundness of the blocks. Because the record does not indicate that Neville's action in forming these blocks into planks was unreasonable, Neville should recover this item of damages, using the standard measure contained in §2-714(2).

The second and third items of damages outlined above concern expenses incurred by Neville in hauling away the defective blocks and planks. These items should be recoverable as a "loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable" under §2-714(1).

In regard to the fourth item, Neville makes no claim for delivery costs, lost production time, increased ex-

penses, or lost profits. Neville only seeks to recover the cost of the finished systems which were rejected by its customers. Mr. Lanza, Neville's Vice-President for Operations, testified that these systems were rejected because they contained excessive cracks. He further testified that the cracks in these planks were similar to the cracks in the planks which Neville itself rejected prior to shipment to the job sites. Thus, this item of damages is identical to the first item above, the only difference being the time and place of rejection. Because Neville seeks damages only for the rejected plank itself, this item should be awarded to Neville under §2-714(2).

The final two items sought by Neville, the costs of placing special covers on certain ceilings and the excess costs for additional pointing and caulking, should be denied. These expenses could have been totally avoided had Neville rejected the planks at some point prior to their installation into ceilings. Mr. Hensel admitted that blocks of questionable appearance were formed into planks and installed at various job sites. This action was unreasonable, because Neville knew, or should have known, that its customers might not wish to accept structurally sound ceilings which were less than desirable aesthetically. This case does not involve the question of whether the buyer was negligent in not discovering a defect before incorporating the item in some end product. Rather, this is a case where goods were used despite known defects. Neville's action served to aggravate the damages it now seeks to recover from Lampus. Neville certainly had a reasonable alternative available—it could have simply rejected the finished planks for substandard appearance in breach of Lampus's warranties. While such action would have prevented Lampus from recovering the price Neville contracted to pay for the blocks, it would have avoided

the excess costs incurred by Neville to enhance the appearance of its finished systems.

To summarize: The trial court correctly determined that *Keystone Diesel* is controlling on the question of whether Neville should be awarded the consequential damages it requested. The trial court, however, incorrectly concluded that the damages sought by Neville were not within the contemplation of the parties at the time they entered into the contracts at issue, because the record reveals that sufficient facts were communicated to Lampus to put it on notice that Neville intended to hold it responsible for the damages it seeks to recover. However, Neville cannot recover on two of the six categories of damages it seeks because they were losses which could have been prevented within the meaning of §2-715(2)(a). Thus, Neville should recover on only the first four of the six items of damages which were denied by the court below.

The judgment of the court below is reversed in part, and the case remanded with instructions to award recovery on the first four items of damages which were denied by the trial court if the court determines that the amounts of damages claimed under each item are reasonable.