**AMERICAN ELECTRIC POWER COMPANY, INC., et al., Plaintiffs,**

v.

**WESTINGHOUSE ELECTRIC CORPORATION, Defendant.**

**No. 74 Civ. 1521.**

United States District Court, S. D. New York.

July 19, 1976.

ard Seltzer, William Thomashower, Ettie Ward, Karen Katzman, New York City, for plaintiffs.

Olwine, Connelly, Chase, O'Donnell & Weyher by John Logan O'Donnell, Charles D. Donohue, Jr., Bruce E. Pindyck, Joseph C. Kaplan, Peter Aron, Michael E. Twomey, James B. Keaney, New York City, for defendant Westinghouse Elec. Corp.

## OPINION

ROBERT L. CARTER, District Judge.

Defendant Westinghouse Electric Corporation ("Westinghouse") has moved, pursuant to Rule 56, F.R.Civ.P., for summary judgment dismissing plaintiffs' claims in their entirety and awarding Westinghouse judgment on Count I of its counterclaim. In the alternative, Westinghouse has moved for partial summary judgment dismissing plaintiffs' claims for consequential damages. Plaintiffs have moved, pursuant to Rule 15(a), F.R.Civ.P., for leave to amend their complaint and their reply to defendant's counterclaim.

I

*Facts*

Beginning in September, 1965, plaintiff American Electric Power Company, Inc. ("AEP")[1] and defendant Westinghouse commenced negotiations on the design, manufacture and construction of a new turbine generator which came to be known as Mitchell Unit I. AEP made an oral commitment to purchase that turbine generator on December 28, 1965. Subsequent negotiations over a period of more than two years culminated in the execution of a fully integrated written contract signed by plaintiff Appalachian Power Co. on April 26, 1968, and by Westinghouse on May 9, 1968.

The Mitchell Unit I Contract provides that Westinghouse will manufacture and deliver a steam turbine generator guaran-

Kaye, Scholer, Fierman, Hays & Handler by Paul J. Curran, David Klingsberg, Rich-

---

1. Defendant contends that AEP is not a proper party to this action since it derived no rights under the Mitchell Unit I contract. This contention is fully explored under the headings of Third Party Beneficiaries, *infra.* For the sake of convenience I have referred to plaintiffs' claims as those of AEP. This shorthand reference should not be construed as conferring any greater rights on plaintiff AEP than those outlined *infra.*

teed to produce 760,582 kilowatts of electrical energy under certain specified steam conditions.[2]

By the express terms of the contract's "Guarantee" provision, the parties excluded implied warranties and agreed that Westinghouse's entire obligation for defects in Mitchell Unit I would be fulfilled by the repair or replacement of defective parts for one year after initial synchronization [3] with corrected parts thereafter carrying a new one-year warranty. In addition, the parties also agreed in a separate "Limitation of Liability" provision that Westinghouse would not be held liable for consequential damages. Furthermore, the Limitation of Liability clause limited the liability of Westinghouse with respect to the contract or anything done in connection therewith to the price of the equipment or part on which such liability is based.

Because of their importance to the disposition of the instant motions, these two provisions will be set out in full:

"*GUARANTEE*

"The turbine-generator as manufactured will be warranted against defects in materials and workmanship for a period of one year after date of initial synchronization in accordance with the following statement of warranty:

"The Seller warrants that the equipment to be delivered will be of the kind and quality described in this contract and will be free of defects in workmanship and material. Should any failure to conform to this warranty appear within one year after the initial date of synchronization, the Seller shall, upon notification thereof and substantiation that the equipment has been stored, installed, maintained and operated in accordance with the company's recommendations and standard industry practice, correct such defects including non-conformance with the specification, by suitable repair or replacement at its own expense.

"Any component requiring repair or replacement should hereafter carry a one year warranty starting from the date the unit is again returned to service after such correction.

"This warranty is exclusive and is in lieu of any warranty of merchantability, fitness for purpose or other warranty of quality, whether express or implied, except of title and against patent infringement.

"Correction of non-conformities, in the manner and for the period of time provided above, shall constitute fulfillment of all liabilities of the Company to the purchaser, whether based on contract, negligence or otherwise with respect to, or arising out of such equipment."

"*LIMITATION OF LIABILITY*

"Except as otherwise agreed herein, the Seller shall not be liable for special,

---

**2.** The Mitchell Unit I contract contains two guaranteed kilowatt output figures: 760,582 kw at certain optional steam conditions and 736,704 kw at certain lesser steam conditions. The contract also contains an "expected capability" or "maximum calculated capability" figure of 831,160 kw. Plaintiffs contend that this latter figure constitutes an "affirmation of fact or promise" that is part of the basis of the bargain sufficient within the meaning of § 2–313(a) of the U.C.C. to create an express warranty that the Unit would produce 831 mw. There is no reason, however, in the case of a contract between two commercial giants, negotiated over a period of many months by alert and able counsel, to depart from a fundamental tenet of contract interpretation—that whenever possible, words in a contract should be given their plain meaning. *See Restatement of the Law, Contracts* § 235. It is difficult for one to conceive of a "guaranteed figure" and an "ex-

pected figure" giving rise to any interpretational ambiguity. Nevertheless, with perhaps undue deference to the decision of this circuit in *Heyman v. Commerce and Industry Insurance Co.*, 524 F.2d 1317 (2d Cir. 1975), I prefer to have this issue aired at trial. In any event, it is unimportant for purposes of this motion whether the generator's output contracted for was 760 or 831 mw, since it is alleged that AEP's operating experience with the unit reflects such continuous deterioration of the unit at the curtailed load of 690 mw that Mitchell Unit I is incapable of safe, sustained operation even at that level.

**3.** Initial synchronization refers to the first time the turbine-generator is put "on line", *i. e.*, hooked up to the power system such that its electrical energy is integrated with the output of other units and distributed to the consumer.

or consequential damages, such as, but not limited to, damage or loss of other property or equipment, loss of profits or revenue, loss of use of power system, cost of capital, cost of purchased or replacement power, or claims of customers of purchaser for service interruptions. The remedies of the purchaser set forth herein are exclusive, and the liability of Seller with respect to any contract, or anything done in connection therewith such as the performance or breach thereof, or from the manufacture, sale, delivery, resale, installation or technical direction of installation, repair or use of any equipment covered by or furnished under this contract whether in contract, in tort, under any warranty, or otherwise, shall not, except as expressly provided herein, exceed the price of the equipment of [or] part on which such liability is based."

The final contract price of the Mitchell Unit I turbine-generator was $12,260,580.08. To date, the purchaser has made payments totalling $10,868,656.00. The balance due— $1,391,924.08—is sought by Westinghouse in Count I of its counterclaim.

## II

*Operational History of the Generator*

On April 22, 1970, Mitchell Unit I was hooked up, or "initially synchronized" with the AEP system. The first major failure of the generator occurred in July, 1971, when Mitchell Unit I suffered a line-to-ground fault (similar to a short circuit).[4] It is alleged that inspection following this failure revealed cracked copper strands and insulation material which had become soaked by water leaks. A rewinding of the generator was required, during the course of which the Unit was out of service for almost five months. The rewind work was completed in November, 1971, and the Unit returned to service.

On March 1, 1972, the generator suffered a three-phase short circuit at the turbine end which burned out all three phases and necessitated a complete rewinding which required almost five months to complete. It is alleged that an inspection of the generator after this fault revealed dusting at the exciter end of the generator end winding, dusting indicating loose strain blocks, and dusting between the coils and diamond spacer blocks. All these problems, it is claimed, are evidence of loose bracing.

Since completion of the second generator rewind in July, 1972, Westinghouse has recommended full load operation (*i. e.*, at the 760 mw level or higher),[5] but AEP has limited the Unit's load to 690 mw, or 90 percent of the guaranteed contract capacity. The reason given by plaintiffs for this limitation is that the generator is unable to absorb continuously the high vibration developed in the generator when the Unit is operated at or near the warranted capacity. *See Tillinghast* Tr., p. 1055. Thus, John E. Dolan, the AEP Vice President who determined Mitchell Unit I's present load limit of 690 mw, related that:

"Even at 690,000 kw the Unit is not commercially acceptable nor is it even close to industry standards of reliability. Its present operation at reduced loading is resulting in serious deterioration of the Unit, and requires frequent inspection and repairs. Based upon industry stan-

---

4. Several prior failures of the generator are also alleged. See Plaintiffs' Rule 9(g) Statement at ¶ 49.

5. In December, 1973, Donald Cook, President of Appalachian Power Company, for the first time requested a new generator. Westinghouse denied the request, urging instead that AEP increase the Unit's load to 760 mw or higher. Westinghouse steadfastly believes that Mitchell Unit I is capable of operating at its 760 mw contract rating and has continuously urged AEP to increase the Unit's output to that level or higher. *See, e. g.*, Shay Tr., p. 445. Indeed, defendant asserts that in March, 1974, the Unit's load was increased to 780 mw but had to be reduced—not because of generator conditions but because of limitations in the boiler—a non-Westinghouse product. Shay Tr., p. 489. In any event, it is plaintiffs' contention that Westinghouse's representations to AEP to the effect that the Unit is "satisfactory for full load" operation is evidence of a continued, willful repudiation of its contractual obligation to repair or replace defects in the Mitchell Unit I generator.

dards, Mitchell Unit I is not capable of operating without unacceptable deterioration at even the 690,000 kw level."

(Dolan Aff., ¶ 6)

According to the affidavits of Edwards, Rotating Machinery Staff Electrical Engineer for AEP, and Kindl, an outside technical expert retained by plaintiffs, even at the present reduced load, Mitchell Unit I is unsafe in the event of a sudden short circuit and exhibits dangerous deterioration which could lead to catastrophic failure.

### III

*Plaintiffs' Claims—Motion to Amend*

■ On April 3, 1974, plaintiffs commenced this action against Westinghouse. Plaintiffs claim that Westinghouse breached both the express warranties of the Mitchell Unit I contract and implied warranties that the turbine-generator would be of merchantable quality and fit for its particular purposes. Plaintiffs have further alleged that Westinghouse was negligent in the design, manufacturing, testing and repair of the Unit.

On November 3, 1975, plaintiffs moved, pursuant to Rule 15(a), F.R.Civ.P., to amend their complaint to allege, as an independent basis of liability, that Westinghouse fraudulently induced AEP to enter into the Mitchell Unit I contract.

The essence of AEP's claim of fraud is that Westinghouse knew, prior to the execution of the contract, that it was not undertaking the necessary research, testing and development to provide a turbine-generator capable of operating safely and reliably at the contractual output.

While it is impossible to summarize fully the voluminous record of technical data submitted in support of this motion, it will suffice to highlight some of the evidence adduced by AEP on its fraud claim. Thus, it is alleged that Westinghouse knew at the time it entered into the contract with AEP that Westinghouse had rejected a bracing system necessary to protect the Unit; that Westinghouse intentionally under-designed the Unit such that it failed to meet contract

and industry standards; that Westinghouse intentionally omitted necessary improvements from the Unit before entering into the contract and concealed these omissions from AEP. These alleged omissions included, *inter alia,* lack of accommodation for axial thermal expansion, improper banding of stator coils, inadequacy of twine ties for bracing and the failure to use fibrous banding of end turn coils, the deliberate rejection of accurate force calculations which had mandated better bracing in the AEP generator, and the installation of unsuitable insulation.

In addition to the claim of fraudulent inducement, AEP charges that Westinghouse similarly knew that it was perpetrating a further fraud in continuing to conceal fundamental defects in the Unit at the time of shipment, and that such concealment of defects precluded AEP from refusing delivery of the Unit. In effect, AEP charges Westinghouse with active concealment, misrepresentation and willful delay thus preventing discovery, and prolonging correction of inherent and persistent design defects in Mitchell Unit I.

Finally, AEP contends that Westinghouse continued to defraud it after the execution of the Mitchell Unit I contract by misrepresenting to AEP that it had remedied the defects in the turbine-generator. It is claimed that these misrepresentations, on which AEP relied, caused it to refrain from taking alternative action to stem the damages it was suffering.

Rule 15(a) expressly provides that leave to amend "shall be freely given when justice so requires." Despite the liberal amendment policy underlying Rule 15(a), the Supreme Court has stated that leave to amend may be denied, *inter alia,* on a showing of any of the following: (i) undue prejudice to the opposing party; (ii) undue delay; (iii) futility of the amendment. *Foman v. Davis,* 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Feldman v. Lifton,* 64 F.R.D. 539, 542 (S.D.N.Y.1974).

In my view, plaintiffs' proposed amendment is not futile in the sense that the claim advanced—at least for purposes of

this motion—can be deemed to be legally insufficient on its face or otherwise clearly without merit. *See Middle Atlantic Utilities Co. v. S.M.W. Development Corp.,* 392 F.2d 380, 386–87 (2d Cir. 1968); *Vine v. Beneficial Finance Co.,* 374 F.2d 627, 636 (2d Cir.), *cert. denied,* 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967); *Christophides v. Porco,* 289 F.Supp. 403, 408 (S.D.N.Y.1968); 6 Wright & Miller, *Federal Practice and Procedure* § 1487 (1971 ed.).

Here, the proposed amendment amplifies, with the particularity requisite under Rule 9(b) of the Federal Rules,[6] the allegations of fraud contained in paragraph 14 of plaintiffs' original complaint, and constitutes an alternative theory for recovery to those previously alleged. *See Foman v. Davis, supra,* 371 U.S. at 182, 83 S.Ct. 227; *see generally,* 3 J. Moore, *Federal Practice* ¶ 15.08[3] (2d ed. 1974).

Nor is this a case where the facts on which the proposed amendment is based were known to the moving party at an earlier date, and the motion to amend was delayed for a substantial period of time without excuse. *Cf. Feldman v. Lifton, supra,* 64 F.R.D. at 542–3.

Thus, plaintiffs contend that their claims of fraud are based in substantial part on information only recently obtainable during the course of pretrial discovery. While it is true that many documents relied on by AEP were in their hands at least as of October, 1974—over one year before initiation of the motion to amend—this delay is not inordinate or inexcusable, particularly in view of the extensive and continuing discovery being carried on to date, which plaintiffs claim tie together and buttress

their claims of fraud. This factor lends additional support for granting leave to amend. *See, e. g., Glazer Steel Corp. v. Yawata Iron & Steel Co., Ltd.,* 56 F.R.D. 75, 78 (S.D.N.Y.1972).

Finally, there is little prejudice to the defendant since the factual showing necessary to support plaintiffs' claims of fraud will arise out of the same transactions and occurrences which are already the subject matter of this lawsuit—namely, the sale, design, manufacture and repair of Mitchell Unit I. *See, e. g., Lewis v. Marine Midland Grace Trust Co. of New York,* 63 F.R.D. 39, 51 (S.D.N.Y.1973).[7]

Accordingly, plaintiffs' motion to amend their complaint to add a claim for fraudulent inducement and misrepresentation is hereby granted.

Plaintiffs also seek leave to amend their reply to Westinghouse's counterclaim by adding a statute of limitations defense. Plaintiffs' motion is granted. While there is absolutely no excuse on the record before me for AEP's failure to raise this affirmative defense in their July, 1974 reply to Westinghouse's counterclaims, and while the information upon which such a defense would have been predicated was not obtained only recently, there is little prejudice to the defendant in allowing the amendment— at least not in the sense that Westinghouse could have sued in another jurisdiction had the statute of limitations defense been raised in a more timely fashion. *Cf. Strauss v. Douglas Aircraft Co.,* 404 F.2d 1152, 1155 (2d Cir. 1968). Finally, there is likely to be little need for any further discovery on this issue. Accordingly, plaintiffs' motion to amend their reply to add a

---

**6.** Rule 9(b), F.R.Civ.P., provides:

"*Fraud, Mistake, Condition of the Mind.* In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. . . ."
*See Felton v. Walston & Co., Inc.,* 508 F.2d 577 (2d Cir. 1974).

**7.** Westinghouse strenuously urges that grant of the motion to amend will convert this action into a wholesale attack on Westinghouse's professional reputation and on the design, manufacture and repair of all Westinghouse turbine-generators from the early 1960's to date, and

that the discovery necessary to prepare for trial on these issues would be "mind-boggling." It does not appear, however, that the discovery necessary on the issue of fraud will be radically different from that which must otherwise be conducted with respect to the other theories of recovery alleged in plaintiffs' original complaint. In any event, while this motion has been *sub judice* the parties have engaged in extensive discovery, much of which has been directed toward the issues raised in plaintiffs' amended complaint.

statute of limitations defense is hereby granted.

## IV

*Motion for Summary Judgment*

■ Before proceeding, it would do well to set out briefly the standards for the grant or denial of this motion for summary judgment. In *Heyman v. Commerce and Industry Insurance Co.,* 524 F.2d 1317 (2d Cir. 1975), and in several other recent pronouncements,[8] our circuit has taken the opportunity to re-emphasize and to highlight several basic propositions of summary judgment doctrine. Thus, it is a "fundamental maxim" that on a motion for summary judgment the court cannot try issues of fact; it can only determine whether there are issues to be tried. *Heyman, supra,* 524 F.2d at 1320. Furthermore,

"... when the court considers a motion for summary judgment, it must resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought, *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962), with the burden on the moving party to demonstrate the absence of any material factual issue genuinely in dispute, *Adickes v. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)."

*Heyman, supra,* 524 F.2d at 1320.

Finally, *Heyman* is particularly significant with respect to the instant motion since it deals with summary judgment in the context of disputed issues of contract interpretation. In this regard, Chief Judge Kaufman took the opportunity to restate the long-standing rule that "[w]here contractual language is susceptible of at least two fairly reasonable interpretations, this presents a triable issue of fact, and summary judgment would be improper." *Heyman, supra,* 524 F.2d at 1320, and cases there cited. Furthermore, "[w]hen a contract is so ambiguous as to require resort to other evidence to ascertain its meaning and that evidence is in conflict, the grant of summary judgment is improper." *Id.*

### Intended Beneficiaries

In ¶ 5 of its complaint, plaintiffs allege that Westinghouse knew at the time it entered into the Mitchell Unit I contract that the completed Unit was intended for operation as a part of the integrated American Electric Power System and that AEP and its operating subsidiaries named as plaintiffs in this action[9] were the intended ultimate users of the Unit and the intended beneficiaries of the Mitchell Unit I contract. Defendant Westinghouse has moved to dismiss the claims of these "intended beneficiary" plaintiffs. In sum, Westinghouse argues that the fully integrated Mitchell Unit I contract evidences absolutely no intention to confer any rights on third parties; that the Ohio Power Company is the only proper party plaintiff; and that all other named plaintiffs are not proper parties to this action and, accordingly, their claims should be dismissed.

The Mitchell Unit I contract provides for the sale by Westinghouse of one turbine-generator to a single purchaser—the Appalachian Power Company. The commercial terms and conditions contained in the contract's "General Conditions" relate solely to the "Purchaser" and "Seller." Similarly, the contract's technical provisions are contained in a section of the contract entitled "Turbine-Generator Proposal Prepared for American Electric Power Service Corporation for Appalachian Power Company-

---

8. See *Judge v. City of Buffalo,* 524 F.2d 1321 (2d Cir. 1975); *Jaroslawicz v. Seedman,* 528 F.2d 727 (2d Cir. 1975); *Home Insurance Co. v. Aetna Casualty and Surety Co.,* 528 F.2d 1388 (2d Cir. 1976); *United States v. Bosurgi,* 530 F.2d 1105 (2d Cir. 1976); *Gladstone v. Fireman's Fund Insurance Company,* 536 F.2d 1403 (2d Cir. 1976).

9. These plaintiffs are American Electric Power Company, Inc., Appalachian Power Company, Indiana & Michigan Electric Company, Kentucky Power Company, and Ohio Power Company.

Mitchell # 1." Finally, the contract was signed by Donald C. Cook in his capacity as President of Appalachian Power Company.

Effective October 17, 1968, Appalachian Power Company assigned all of its interest in the Mitchell Unit I contract to plaintiff, Ohio Power Company. *See* Complaint ¶ 3. Thus, argues Westinghouse, Ohio Power Company has replaced Appalachian Power Company as the "Purchaser" under the Mitchell Unit I contract, and it alone may assert claims thereunder.

Westinghouse also points to the post-assignment conduct of the various parties as evidence that Westinghouse's obligations under the contract extend only to Ohio Power Company. Thus, for example, various modifications in contract specifications and price changes were authorized by Ohio Power Company. Similarly, on December 7, 1973, AEP's former chairman Donald Cook wrote to Westinghouse's then Chairman, Donald C. Burnham, to urge that Westinghouse agree to undertake the design and fabrication of a new generator "to minimize the financial losses being suffered by Ohio Power." *Cook Aff.,* ¶ 13(a). Again, on January 16, 1974, Cook made a similar request "[i]n view of the severe financial losses that Ohio Power is suffering as a result of the continued operation of Mitchell Unit I at reduced load." *Cook Aff.,* ¶ 13(c). Such conduct, Westinghouse asserts, is consistent with the contractual intent to confer benefits only on the Purchaser.

In response, plaintiffs argue that they are all part of a single integrated electric utility system established in accordance with the Public Utility Holding Company Act of 1935, 15 U.S.C. § 79, *et seq.,* and that Mitchell Unit I was clearly intended for the use and benefit of the entire AEP System.[10] In particular, plaintiffs point to the fact that Westinghouse has admitted in its answer that "at the time Westinghouse entered into the [Mitchell Unit I] contract, it knew that the completed unit was intended for operation as part of the American Electric Power System." (Answer, ¶ 5.)[11] Westinghouse also admitted in ¶ 4 of its Answer:

> "that plaintiff American Electric Power Company, Inc. (hereinafter 'AEP') is an investor-owned public utility, that AEP coordinates the operations of some or all of its subsidiaries such that they function as a single, integrated electric utility system known as the American Electric Power System, and that the energy generated by the [Mitchell I] Unit is commingled with the energy generated throughout the American Electric Power System."

Thus, at the time the contract was entered into, Westinghouse was aware of the coordinated operation of all units in the AEP System. *See* Tillinghast Aff., ¶ 5, Oct. 31,

**10.** Plaintiff AEP is an investor-owned public utility holding company which owns 100% of the common stock of the other four plaintiff operating electric companies. The Annual Report of AEP presents a consolidated income statement and balance sheet for the combined AEP System. The Chairman of the Board of AEP is simultaneously the President of each subsidiary operating company, including the four other plaintiffs. Moreover, AEP, pursuant to § 13(d) of the Public Utility Holding Company Act, 15 U.S.C. § 79m(d), has created a wholly-owned subsidiary, the American Electric Power Service Corp. ("AEPSC") to provide centralized management, engineering and purchasing services for the wholly-owned operating subsidiaries in the AEP system. AEPSC conducts the coordinated planning and operation of the entire AEP system, including decisions with regard to purchase and siting of generators, load forecasting, levels of power generation for each unit, maintenance, and power purchases and sales. *See* Vassell Aff., ¶ 5, April 8, 1976. At the same time, however, there is no dispute that each subsidiary of AEP, as well as that parent holding company itself, is an independent corporate entity with separate officers, directors, and principal places of business. As such, each plaintiff prepares and files its own reports with the Federal Power Commission, the Securities Exchange Commission, and various state regulatory bodies.

**11.** In the same paragraph of its Answer, Westinghouse denied that it knew at the time it entered into the Mitchell Unit I contract that plaintiff AEP and its operating subsidiaries named as plaintiffs were the intended ultimate users of the Unit and the intended beneficiaries of the contract.

1975. *See also,* Tillinghast Tr., p. 661. It is also alleged that Westinghouse was aware that the integrated nature of the AEP System requires that the physically inter-connected units of the AEP System supply power to meet the electrical demands of customers on the entire system,[12] and that Mitchell Unit I was purchased "as part of the electric power production resources" of the system. Vassell Aff., ¶¶ 3–5, Oct. 22, 1975. *See also,* Hoffmeister Tr., pp. 32–33.[13] Moreover, it is conceded that all of the contract negotiations were conducted for AEP by employees of AEPSC, the management arm of AEP. Tillinghast Tr., p. 735. No negotiations were conducted with representatives of any particular operating company. Tillinghast Aff., ¶ 4. In addition, various correspondence between the parties indicates that Westinghouse understood that the turbine-generator was to be used as part of the overall AEP System.[14] Furthermore, on January 31, 1966, Westinghouse issued a press release, which read, in part, as follows:

"WESTINGHOUSE ELECTRIC CORPORATION HAS BEEN AWARDED A CONTRACT BY AMERICAN ELECTRIC POWER SYSTEM FOR AN 800,-000 KILOWATT TURBINE GENERATOR, IT WAS ANNOUNCED TODAY.

.    .    .    .    .

"THE ORDER IS PART OF A 2,400,-000 KILOWATT EXPANSION OF GENERATING CAPACITY ANNOUNCED BY AEP TODAY. THE UTILITY, LARGEST INVESTOR–OWNED ELECTRIC ENERGY PRODUCER IN THE COUNTRY, PLANS TO HAVE A 12,-500,000 KILOWATT GENERATING CAPACITY BY 1971.

"AEP SERVES 5,600,000 PEOPLE IN PARTS OF OHIO, INDIANA, MICHIGAN, KENTUCKY, TENNESSEE, WEST VIRGINIA AND VIRGINIA."

Based on these facts, plaintiffs other than Ohio Power Company (hereinafter the "non-signatory plaintiffs") argue that they are entitled to recover in this action as third-party beneficiaries of the contract entered into between Westinghouse and Ohio Power Company (as assignee of the Appalachian Power Company).

It is evident that the parties, had they so desired, could have explicitly provided in the contract that the benefits to be derived thereunder would extend to third parties. The contract, however, is uniquely silent in this regard. Thus, if plaintiffs are to prevail in their contentions, our inquiry must extend beyond the four corners of the contract, and reference must be had to the facts and circumstances surrounding the execution of the Mitchell Unit I contract, and to the intent of the parties with regard thereto. The issue for decision is whether such matters extrinsic to the contract may be considered in determining the rights of the "intended beneficiaries." Such an inquiry is further complicated by the fact that the choice of law issues raised by the parties cannot be resolved until trial, or at the least, must await further hearings.[15] Defendant Westinghouse urges that Pennsylvania law applies to the controversy,

---

**12.** The level of power generation of each turbine-generator on the AEP System is determined minute by minute by a central AEP System Computer, which determines the most economic electrical pattern of loading for all units on the System. This centralized loading of individual turbine-generators, including Mitchell I, is conducted without regard to which operating subsidiary owns any particular unit.

**13.** Plaintiffs also suggest that it was obvious to anyone knowledgeable about the operation of electric utility systems that a turbine-generator capable of producing 760 mw of power must have been intended for use by the entire AEP System and not solely by one operating company the size of the Appalachian Power Company, since it is a generally recognized industry practice that the size of any single generating unit to be installed on an electric power system in any given year not exceed a certain maximum percentage (usually 10%) of that power system's size. This is done in order that the reliability of electric power supply not be jeopardized by a forced or scheduled outage of a unit too large in proportion to the power system's total generating capacity.

**14.** *See, e. g.,* Def. Ex. 38, Letter from J. W. Simpson to Philip Sporn, Dec. 28, 1965.

**15.** See Note 36, *infra.*

while plaintiffs argue that New York law governs.

## Pennsylvania Law

■ The law of third-party beneficiaries in Pennsylvania was stated by the Supreme Court of Pennsylvania in *Spires v. Hanover Fire Ins. Co.*, 364 Pa. 52, 70 A.2d 828, 830–31 (1950) as follows:

> "To be a third party beneficiary entitled to recover on a contract it is not enough that it be intended by *one* of the parties to the contract and the *third person* that the latter should be a beneficiary, but *both parties to the contract* must so intend and must indicate that intention in the contract; in other words, a promisor cannot be held liable to an alleged beneficiary of a contract unless the latter was within his contemplation at the time the contract was entered into and such liability was intentionally assumed by him in his undertaking; the obligation to the third party must be created, and must affirmatively appear, in the contract itself."

(Emphasis in original; citations and footnotes omitted.)

*See also, Commonwealth Liquor Control Bd. v. Rapistan, Inc.*, 14 Pa.Cmwlth. 501, 323 A.2d 410, 414 (1974); *Mowrer v. Poirier & McLane Corp.*, 382 Pa. 2, 114 A.2d 88, 89 (1955); *Lobianco v. Valley Forge Military Academy*, 224 F.Supp. 395, 400 (E.D.Pa. 1963), *aff'd*, 331 F.2d 851 (3d Cir. 1964). While it is true under Pennsylvania law that the question whether a contract was intended for the benefit of a third person is always one of construction, and the intention of the parties in this respect is determined by the terms of the contract as a whole, construed in the light of the circumstances under which the contract was made, *Silverman v. Food Fair Stores, Inc.*, 407 Pa. 507, 509–10, 180 A.2d 894, 895 (1962); *Commonwealth Liquor Control Bd. v. Rapistan, Inc., supra,* 323 A.2d at 414; *Hillbrook Apartments, Inc. v. NYCE Crete Co.*, 237 Pa.Super. 565, 352 A.2d 148, 151 (1975), this does not alter the rule in *Spires* that the intent to confer a benefit on a third party

must affirmatively appear in the contract itself.

Plaintiffs place primary reliance on the decision of the Pennsylvania Supreme Court in *Line Lexington Lumber & Millwork Co., Inc. v. Pennsylvania Publishing Corp.*, 451 Pa. 154, 301 A.2d 684 (1973). In *Line Lexington* the lessee of a building applied for fire insurance for the benefit of the plaintiff, the owner of the building. The insurance broker, although aware of the intent to benefit the plaintiff, failed to designate the plaintiff as the insured party. The Supreme Court held that the lower court had properly sustained defendants' demurrer, and stated that a cause of action for reformation had been properly pleaded. However, the court found inapposite the third-party beneficiary cases denying relief to a third party, since in those cases there was no manifest intent embodied in the contract to confer a benefit on the third party. Instead, the *Line Lexington* court found that the complaint alleged that although the intent to benefit was clearly present it had not been duly embodied in the contract and that reformation of the contract was therefore the appropriate remedy. In *Hillbrook Apartments, supra,* the court held that *Line Lexington* did not represent a retrenchment from the Pennsylvania rule as enunciated in *Spires.*

■ Since no intent to confer a benefit on a third party affirmatively appears in the Mitchell Unit I contract, the non-signatory plaintiffs are not entitled to recover under Pennsylvania law as third-party beneficiaries.

However, even if Pennsylvania law is found to govern this controversy, plaintiffs may nonetheless recover, not, strictly speaking, as third-party beneficiaries of the contract, but rather as principals to the contract entered into by their agent. *See Bata v. Central-Penn National Bank of Philadelphia*, 448 Pa. 355, 293 A.2d 343, 355 (1972), *cert. denied,* 409 U.S. 1108, 93 S.Ct. 910, 34 L.Ed.2d 689 (1973); *see also Merrick v. New York Subways Advertising Co.*, 14 Misc.2d 456, 178 N.Y.S.2d 814, 818 (Sup.Ct. N.Y.Co.1958), to the same effect. Thus,

plaintiffs assert that the Mitchell Unit I contract was entered into by Appalachian Power Company acting as agent on their behalf as well as on its own.

■ It is well settled that a principal may sue to recover under a contract made by his agent, even where the agency relationship is undisclosed and where the contract does not identify the third party as a principal. Thus, *Restatement (Second) of Agency,* § 302 (1958) provides:

"A person who makes a contract with an agent of an undisclosed principal, intended by the agent to be on account of his principal and within the power of such agent to bind his principal, is liable to the principal as if the principal himself had made the contract with him, unless he is excluded by the form or terms of the contract, unless his existence is fraudulently concealed or unless there is set-off or a similar defense against the agent."

*See also, Heilwood Fuel Co., Inc. v. Manor Real Estate Co.,* 405 Pa. 319, 175 A.2d 880, 883 (1961).

■ There is no indication on the record before me that the Mitchell Unit I contract excludes liability to any principal—undisclosed or otherwise. *See Restatement (Second) of Agency,* § 303(b) (1958). Nor is there any indication that the existence of an agency relationship was fraudulently concealed. On the contrary, the record indicates that Westinghouse was well aware of the relationship between Appalachian Power Company and the non-signatory plaintiffs.

Of course, the existence of an agency relationship between the Appalachian Power Company and the remaining plaintiffs is a question of fact which cannot be resolved on the instant motion.[16] *See, e. g., Bertran Packing Inc. v. Transworld Fabricators, Inc.,* 50 A.D.2d 542, 375 N.Y.S.2d 335, 337 (1st Dept. 1975). If such relationship if found to exist, the non-signatory plaintiffs, as principals to the contract, would be entitled to assert all remedies available to the party who actually entered into the contract.

*New York Law*

The law of New York is somewhat more liberal than that of Pennsylvania with respect to recovery by a third-party beneficiary, and does not require that the intent to confer a benefit affirmatively appear within the four corners of the agreement. Thus, in *Cutler v. Hartford Life Ins. Co.,* 22 N.Y.2d 245, 253, 292 N.Y.S.2d 430, 438, 239 N.E.2d 361, 366 (1968), the New York Court of Appeals held that an individual not named in an insurance contract was the intended beneficiary of that contract:

"In truth, as between Crosby and the wife, the wife is the intended beneficiary, or, at least, the ultimate intended beneficiary (cf. Restatement, 2d, Contracts [Tent.Draft No. 3, April 18, 1967], § 133, including Comments *a, c,* and *d,* indicating the importance of the manifested intention and surrounding circumstances in determining who are the actual intended beneficiaries, rather than relying merely on the form of the transaction or who receives the performance from the promisor; Restatement, Contracts, § 136, subd. [2]; Restatement, 2d, Contracts [Tent. Draft No. 3, April 18, 1967], § 136, subd. [1]) "[17]

---

**16.** Similarly, whether the existence of an agency relationship survived the assignment of the contract from the Appalachian Power Company to Ohio Power Company on October 17, 1968 is likewise a question of fact which must be determined at trial.

**17.** In *Cutler,* Judge Breitel specifically relied upon § 133 of the Restatement (Second) of Contracts (Tent.Drafts 1–7 Rev.Ed.1973) which provides, in pertinent part, as follows:

"§ 133. Intended and Incidental Beneficiaries

(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either

(a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

(b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

Similarly, in *Salzman v. Holiday Inns, Inc.,* 48 A.D.2d 258, 369 N.Y.S.2d 238 (4th Dept. 1973), the court held:

> "The general rule with regard to third party beneficiary contracts is that an intent to confer a direct benefit on a third party must clearly appear in order to enable such a party, not named in the contract, to recover thereunder."

369 N.Y.S.2d at 242.

*But see, Hylte Bruks Aktiebolag v. Babcock & Wilcox Co.,* 399 F.2d 289, 292 (2d Cir. 1968);[18] *Cerullo v. Aetna Casualty & Surety Co.,* 41 A.D.2d 1, 341 N.Y.S.2d 767, 770 (4th Dept. 1973); *Resinol v. Valentine Dolls, Inc.,* 14 A.D.2d 853, 220 N.Y.S.2d 884 (1st Dept. 1961).

In sum, under New York law, the intent to confer a benefit on a party not named in the contract must be determined not only from the agreement, but from a careful examination of the surrounding circumstances as well.[19]

Thus, if New York law applies, the non-signatory plaintiffs will be entitled to recover under the contract if they can affirmatively demonstrate that the contract and the circumstances surrounding its formation evidence an intent to confer a benefit on them. Clearly, the intent to confer a benefit on third parties is an issue of fact. Since neither the choice of law question nor the intent of the parties can be decided on the instant motion, *see Heyman v. Commerce & Industry Ins. Co., supra,* defendant's motion is, to this extent, denied.

With respect to their claims for negligence, plaintiffs argue that notwithstanding third-party beneficiary or agency doctrine, they are entitled to recover for Westinghouse's alleged affirmative acts of negligence in the design, manufacture, testing and attempted repair of the Unit. It is true both under the law of New York and Pennsylvania that a manufacturer may be liable to all persons whom it could foresee would be harmed by its negligent acts, apart from any contractual liability. *See, e. g., Melodee Lane Lingerie Co. v. American District Telegraph Co.,* 18 N.Y.2d 57, 271 N.Y.S.2d 937, 941, 218 N.E.2d 661 (1966); *Kassab v. Central Soya,* 432 Pa. 217, 246 A.2d 848, 854 n.6 (1968); *Doyle v. South Pittsburgh Water Co.,* 414 Pa. 199, 199 A.2d 875 (1964). *See also, H. R. Moch Co. v. Rensselaer Water Co.,* 247 N.Y. 160, 159 N.E. 896 (1928). This theory of recovery, however, is of little avail to the non-signatory plaintiffs under the facts of this case. The Mitchell Unit I contract specifically provides in the Guarantee and Limitation of Liability provisions that the correction of non-conformities by Westinghouse shall constitute fulfillment of all its liabilities—whether based on contract, negligence or otherwise. In addition, the parties agreed that Westinghouse would not be liable in tort for special or consequential damages.

It would be inconsistent in the extreme for the non-signatory plaintiffs to assert vigorously that they are parties to the Mitchell Unit I contract by virtue of agency or third party beneficiary doctrine, while at

---

Subsequent Tentative Drafts of the Restatement 2d have not changed the import of § 133. *See also,* 2 Williston on Contracts § 402 (3d ed. 1959).

**18.** *Hylte Bruks, supra,* is distinguishable on the ground that the contract there in issue contained a clause expressly precluding the use of extrinsic evidence by a third party who might seek to maintain a legally enforceable right in the contract. 399 F.2d at 292, 293 n.6.

**19.** Defendant relies on *Beveridge v. New York Elev. R.R. Co.,* 112 N.Y. 1, 19 N.E. 489 (1889) and *In Re Conay's Estate,* 29 Misc.2d 1090, 121 N.Y.S.2d 481 (Sup.Ct.N.Y.Co.1953), *aff'd,* 284 A.D. 950, 135 N.Y.S.2d 626 (1st Dept. 1954).

In *Beveridge, supra,* 112 N.Y. at 26, 19 N.E.at 496, the court held:

> "Within the principles of adjudged cases in this court, where the plaintiff seeks to base his right to maintain his action against a third party upon a contract made between that party and another, it must be one made or intended for his benefit. Such a beneficial intent must be clearly found in the agreement."

It would appear after *Cutler,* however, that *Beveridge* no longer fully states the law of New York. The commentators are generally sympathetic with the New York rule. *See, e. g.,* 4 Corbin on Contracts §§ 776–777 (1951 ed.). *See also, Riegel Fiber Corp. v. Anderson Gin Co.,* 512 F.2d 784, 787 (5th Cir. 1975).

the same time contending that they are not bound by the limited remedies for breach incorporated in the precise terms of the agreement.

■ Similarly, the non-signatory plaintiffs' assertion that they are entitled to recover for breach of warranty apart from defendant's contractual liability is unpersuasive. Again, plaintiffs can derive no greater rights outside the contract than they can under its terms. Indeed, this result is contemplated under both New York and Pennsylvania law by § 2–318 of the Uniform Commercial Code.[20] As the comment to this section makes clear, to the extent that the contract of sale contains provisions under which warranties are excluded or modified, or remedies for breach are limited, such provisions are equally operative against beneficiaries of warranties under § 2–318.

Furthermore, while the purpose of § 2–318 is to give certain beneficiaries the benefit of the same warranty protections which the buyer obtained in the contract of sale, thereby freeing such beneficiaries from the technical requirements of privity of contract, the non-signatory plaintiffs are not within the class of beneficiaries protected by § 2–318. Indeed, neither New York nor Pennsylvania has adopted the third alternative version of § 2–318 which would extend the benefits of the rule beyond injuries to the person. Cf. Restatement (Second) of

Torts § 402A (Tentative Draft No. 10, 1964).[21]

■ Finally, the fraud claims of the non-signatory plaintiffs stand on a different footing. As will appear, infra, the contractual limitations of liability cannot be effective if plaintiffs' claims of fraudulent inducement are sustained at trial. Thus, a non-signatory plaintiff may recover for defendant's alleged fraudulent misrepresentations upon a showing that such plaintiff was within the class of persons whom the defendant should reasonably have expected would rely on the statements, and where that plaintiff in fact relied. See Ultramares Corp. v. Touche, 255 N.Y. 170, 174 N.E. 441 (1931); Gillespie v. Hunt, 276 Pa. 119, 119 A. 815, 817, cert. denied, 261 U.S. 622, 43 S.Ct. 519, 67 L.Ed. 832 (1923). See also Restatement (Second) of Torts § 531 (Tent.Draft No. 10 (1964)).

In sum, my disposition with respect to the motion for summary judgment as to the non-signatory plaintiffs is as follows. If Pennsylvania law governs, the non-signatory plaintiffs may not recover on the contract absent a showing that they were principals to the contract entered into on their behalf by Appalachian Power Company acting as their agent.

If New York law governs, plaintiffs may recover either as third-party beneficiaries of, or as principals to the Mitchell Unit I contract. Apart from these two theories of

---

**20.** Section 2–318 of the Pennsylvania Uniform Commercial Code provides as follows:

"*Third Party Beneranties of Warranties Expressed or Implied*

"A seller's warranty whether express or implied extends to any natural person who is in the family or household of his buyer or who is a guest in his home if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty. A seller may not exclude or limit the operation of this section.

Section 2–318 of the New York Uniform Commercial Code provides:

"*Third Party Beneranties of Warranties Express or Implied*

"A seller's warranty whether express or implied extends to any natural person if it is reasonable to expect that such person may use,

consume or be affected by the goods and who is injured in person by breach of the warranty. A seller may not exclude or limit the operation of this section."

**21.** It is true that § 2–318 is not intended to limit the extension of warranty protection by the courts to a broader range of plaintiffs and for a wider spectrum of injuries than those enumerated in that section. See, e. g., Goldberg v. Kollsman Instrument Corp., 12 N.Y.2d 432, 240 N.Y.S.2d 592, 191 N.E.2d 81 (1963); Randy Knitwear, Inc. v. American Cyanamid Co., 11 N.Y.2d 5, 226 N.Y.S.2d 363, 181 N.E.2d 399 (1962); Kassab v. Central Soya, 432 Pa. 217, 246 A.2d 848 (1968); Cyclops Corp. v. Home Insurance Co., 389 F.Supp. 476, 481 (W.D.Pa.), aff'd, 523 F.2d 1050 (3rd Cir. 1975). There is, however, no reason under the facts of this case to extend such protection to third party beneficiaries beyond that provided by the statute.

recovery, plaintiffs will be unable to assert their negligence or warranty causes of action. They will, however, be entitled to assert a claim for fraudulent misrepresentation.

## VI

Relying on the Guarantee and Limitation of Liability provisions of the Mitchell Unit I contract cited *supra,* Westinghouse argues that none of plaintiffs' claims may be maintained. Specifically, Westinghouse asserts that plaintiffs' implied warranty claims are precluded by the contract's Guarantee provision. Furthermore, it is argued that the contract limits the remedy for a breach of express warranty and for negligence to the repair or replacement of defective parts, and that since Westinghouse has fully complied with this warranty provision, no further remedy may be had and summary judgment must be granted.

### (a) Implied Warranties

■■■ With respect to the implied warranty claim, Section 2–316(2) of the Uniform Commercial Code provides:

> "(2) Subject to subsection (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "There are no warranties which extend beyond the description on the face hereof."

It is clear that the contract's Guarantee provision, by its terms, excludes all implied warranties (except title and patent infringement)—including those of merchantability and fitness. Furthermore, the exclusion of implied warranties here in issue was contained in a writing, was conspicuous,[22] and mentioned merchantability.[23] Consequently, plaintiffs may not recover damages from Westinghouse for breach of any implied warranty, and defendant's motion for summary judgment must, to this extent, be granted.[24]

### (b) Fraud

■■■ It is defendant's contention that plaintiffs have adduced no facts to support their contentions of fraudulent inducement and other claims of fraud on the part of Westinghouse. Needless to say, Westinghouse has submitted its own lengthy and detailed response to plaintiffs' factual allegations. In sum, Westinghouse characterizes the plaintiffs' claim as one based on the failure of Westinghouse to incorporate certain design features in the turbine-generator which AEP now contends should have been incorporated—despite the fact that Westinghouse never represented that such features would be included in Mitchell Unit I. In effect, argues Westinghouse, plaintiffs ask the court to make backward inferences of fraudulent conduct because they now desire features to be incorporated in Mitchell Unit I unavailable at the time of design, manufacture and repair of the Unit. Furthermore, says defendant, there has been no evidence adduced relating to any problems experienced by Mitchell Unit I due to the absence of such features. Indeed, there has been no allegation that Westinghouse ever represented that such

---

**22.** Section 1–201(10) of the Uniform Commercial Code provides that a term or clause is conspicuous "when it is so written that a reasonable person against whom it is to operate ought to have noticed it." Whether a term or clause is conspicuous or not is for decision by the court. It strains credulity to suggest that plaintiffs had not noticed or were unaware of the exclusion of implied warranties in the Mitchell Unit I contract.

**23.** While the word "merchantability" was not mentioned in the Limitation of Liability clause, it was contained in the Guarantee clause.

**24.** It is clear that conduct which may obviate the application of a contractual limitation of liability does not necessarily obviate the disclaimer of warranties language. *See Adams v. J. I. Case,* 125 Ill.App.2d 388, 261 N.E.2d 1 (1970); *Koehring Company v. A. P. I., Inc.,* 369 F.Supp. 882, 891 (E.D.Mich.1974).

features would be incorporated in the Unit at all. In many respects, Westinghouse's contentions with respect to plaintiffs' claims of fraud appear to be convincing. It is clear that Westinghouse engineers are engaged in a continuous process of research and development in order to update and improve the design and functioning of their turbine-generators. Surely, Westinghouse cannot be held liable for failure to incorporate design improvements in its generators which have not yet been developed or were only in the planning stages. Nevertheless, plaintiffs have raised significant factual questions with regard to the industry-wide state of the art, and Westinghouse's own research and development program in existence at the time of the design, manufacture and sale of Mitchell Unit I.

■ It is axiomatic that in passing upon a motion for summary judgment the court is bound to accept as true the allegations of the party opposing the motion. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970);

*First National Bank of Cincinnati v. Pepper*, 454 F.2d 626, 629 (2d Cir. 1972). Similarly, a motion for summary judgment cannot be disposed of in a "trial by affidavit." *See Judge v. City of Buffalo*, 524 F.2d 1321, 1322 (2d Cir. 1975). Consequently, to the extent that defendant's motion for summary judgment is directed toward plaintiffs' allegations of fraud, the motion must be denied. *See Teledyne Industries, Inc. v. Eon Corp.*, 373 F.Supp. 191, 198 (S.D.N.Y. 1974).

### (c) Express Warranties and Negligence

■ With respect to remedies for breach of express warranties, or for negligence, it is clear that these may be limited, as they have been in the contract here in issue, to the repair or replacement of defective parts or goods, and other remedies excluded.[25] *See* Uniform Commercial Code, §§ 2–316(4),[26] 2–719.[27] Indeed, warranty and limitation of liability provisions similar, if not identical, to those embodied in the Mitchell Unit I contract have frequently

---

**25.** The Guarantee provision reflects the agreement of the parties that repair or replacement of defective parts would "constitute fulfillment of all liabilities of the Company to the purchaser, whether based on contract, *negligence* or otherwise with respect to or arising out of such equipment." Furthermore, while the Limitation of Liability provision does not specifically mention negligence, it does provide that the remedies of the purchaser are to be exclusive, and the liability of the seller with respect to any contract, or anything done in connection therewith—whether in contract, *in tort*, under any warranty, or otherwise—shall not exceed the price of the equipment or part on which such liability is based. These provisions are certainly broad enough to exclude recovery of consequential damages for any negligence on the part of the defendant. *See Potomac Electric Power Co. v. Westinghouse Electric Co.*, 385 F.Supp. 572, 575 (D.D.C.1974), *reversed and remanded on other grounds*, 527 F.2d 853 (D.C.Cir.1975) (language limiting defendant's liability "in contract or in tort" limited liability based on negligence). *Cf. Posttape Associates v. Eastman Kodak Co.*, 387 F.Supp. 184, 186 (E.D.Pa.1974); *Gimbel Brothers, Inc. v. William H. Vanderherchen, Inc.*, 468 F.2d 597 (3rd Cir. 1972).

**26.** Section 2–316(4) provides:

"(4) Remedies for breach of warranty can be limited in accordance with the provisions of

this Article on liquidation or limitation of damages and on contractual modification of remedy (Sections 2–718 and 2–719)."

**27.** Section 2–719 provides:

"(1) Subject to the provisions of subsections (2) and (3) of this section and of the preceding section on liquidation and limitation of damages,

(a) the agreement may provide for remedies in addition to or in substitution for those provided in this Article and may limit or alter the measure of damages recoverable under this Article, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of non-conforming goods or parts; and

(b) resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.

"(2) Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Act.

"(3) Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not."

been upheld. *See, e. g., Southwest Forest Industries, Inc. v. Westinghouse Electric Corp.,* 422 F.2d 1013, 1019–1020 (9th Cir.), cert. denied, 400 U.S. 902, 91 S.Ct. 138, 27 L.Ed.2d 138 (1970); *Wyatt Industries, Inc. v. Publicker Industries, Inc.,* 420 F.2d 454, 457 (5th Cir. 1969); *Royal Indemnity Co. v. Westinghouse Electric Corp.,* 385 F.Supp. 520, 522 (S.D.N.Y.1974); *Potomac Electric Power Company v. Westinghouse Electric Corp.,* 385 F.Supp. 572, 575 (D.D.C.1974), *reversed and remanded on other grounds,* 527 F.2d 853 (D.C.Cir.1975).[28] Thus, for example, in *Potomac Electric Power Company, supra,* the court considered a contract substantially identical to the one here in issue, and held as follows:

"Within the framework of this commercial transaction the Court perceives no valid legal reason why PEPCO should not be held to the clear and express provisions of the written agreement between the parties. Warranty and limitation of liability clauses such as found in the present contract, which restrict PEPCO's remedies to the repair and replacement of non-conforming parts and limit Westinghouse's liability, regardless of its negligence in causing such nonconformities, are valid and enforceable and have been consistently upheld by the courts. They

are also consistent with Sections 2–316(4) and 2–719(1)(a) and (3), Uniform Commercial Code."
385 F.Supp. at 575.

■ . However, it is AEP's claim, variously expressed in the motion papers, that Westinghouse has acted in bad faith in repairing the Unit,[29] has been willfully dilatory in rendering repairs, and has not merely failed to repair or replace but has repudiated its obligation to repair and replace. As such, plaintiffs argue, the limited and exclusive remedy of repair or replacement provided for in the contract has failed of its essential purpose. *See* U.C.C. § 2–719(2).

The contract between the parties is quite explicit that Westinghouse will not be liable for the long-term maintenance of, or potential defects in the generator. By its terms, the contract provides for a warranty against defects in materials and workmanship for a period of *one year* after the date of initial synchronization, with an additional one-year warranty on components requiring repair or replacement running from the date the Unit is returned to service after such correction has been completed.

Plaintiffs contend, however, that the language in the contract is no longer effective as a waiver of warranties or a limitation on

**28.** The Court of Appeals for the District of Columbia Circuit reversed the District Court's grant of summary judgment, remanding the case to the District Court with instructions to permit additional discovery. Upon conclusion of the remand proceedings, the Clerk of the District Court was directed to return the record as supplemented to the Court of Appeals. The Court of Appeals order was without prejudice to the right of either party to move for summary judgment upon completion of discovery. It is clear that the validity of the legal conclusions reached by the District Court are in no way affected by the disposition of the Court of Appeals.

**29.** There is also a claim that Westinghouse was willfully dilatory and acted in bad faith in making repairs in the Mitchell Unit I turbine—particularly in the 31-inch last stages blades incorporated in the turbine. Thus, it is alleged that over the first year and a half of operation, more than 75 days of actual operation were lost due to blade problems in addition to the thousands of additional megawatt hours lost as a result of

drastically curtailed loading. (*See* Plaintiffs' Att. 71, J. Michalec to H. Scherer, December 2, 1974). AEP further contends that Westinghouse's attempts at repairing the blades during this period amounted to nothing more than replacing the broken blades with new blades of the same inherently defective design. It was not until the late summer of 1971, AEP contends, that properly modified blading was available for installation on the Unit. It is apparently conceded that Mitchell Unit I has not experienced a single 31-inch last row blade failure since installation of the redesigned blades in the summer of 1971. *See* Tillinghast Tr., pp. 803–805; Shay Tr., p. 343. While it would appear from the documents submitted on the motion that Westinghouse engaged in significant research and development work with respect to the turbine blades in an effort to analyze the causes of the blade defects and to determine appropriate corrective measures, and incorporated the results of this research in the repairs made in the Unit, a full elaboration of these factual contentions must await trial.

liability due to the subsequent action—or inaction—of the defendant in performing its responsibilities under the contract.

It is clear that factual issues have been raised regarding Westinghouse's alleged intentional misconduct and the adequacy of its repair work.[30] Thus, this is not a case where it is "undisputed" that the defendant has complied with its warranty obligation to repair or replace. Cf., *Southwest Forest Indus., Inc. v. Westinghouse Electric Corp.,* supra; *Cyclops Corp. v. Home Insurance Co.,* 389 F.Supp. 476, 482–83 (W.D.Pa.), aff'd, 523 F.2d 1050 (3d Cir. 1975); *Potomac Electric Power Co. v. Westinghouse Electric Corp.,* supra; *Royal Indemnity Co. v. Westinghouse Electric Corp.,* supra, 385 F.Supp. at 523; see also, *Fredonia Broadcasting Corp., Inc. v. RCA Corp.,* 481 F.2d 781 (5th Cir. 1973).[31]

Consequently, if AEP's charges regarding Westinghouse's non-performance of its warranty obligations of repair or replacement are sustained at trial, plaintiffs will certainly be entitled to recover their direct and incidental damages pursuant to §§ 2–714 [32] and 2–715(1) [33] of the Uniform Commercial Code.[34] To this extent, therefore, defendant's motion for summary judgment is denied.

*(d) Consequential Damages*

Westinghouse argues that even assuming, *arguendo,* that there exists a triable issue as to whether Westinghouse has performed its warranty obligations to repair or replace, partial summary judgment should nevertheless be granted since plaintiffs are precluded from recovering consequential damages in any event.[35] In es-

---

**30.** There is no dispute that Westinghouse has refused to replace the generator as requested by AEP's Chairman, D. C. Cook, on December 7, 1973. *See* Plaintiffs' Attachments 77–80.

**31.** Defendant asserts that following each incident of generator failure complained of by plaintiffs, it made the necessary repairs and corrections so that the generator could be, and was, returned to service, and that in effectuating such repairs defendant utilized the best corrective methods available. Furthermore, Westinghouse contends that its massive repair work on the Mitchell Unit I during the first two years of its operation, such that the Unit has been capable of essentially continuous generation of at least 690 mw for the past three years, and its redesign and replacement of large turbine blades, generator rewinds, and other corrective work, is conclusive proof of its substantial performance under the contract and its good faith compliance with its warranty obligation of repair or replacement. There is no question, however, that the validity of these contentions cannot be tested on a motion for summary judgment. *See, e. g., Heyman v. Commerce and Industry Insurance Co., supra.*

**32.** Section 2–714 provides:

"(1) Where the buyer has accepted goods and given notification (subsection (3) of Section 2–607) he may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

"(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods

accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

"(3) In a proper case any incidental and consequential damages under the next section may also be recovered."

**33.** Section 2–715(1) of the Code provides for the recovery of incidental damages as follows:

"(1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach."

**34.** The buyer's direct damages are not limited to the measure of damages set forth in UCC § 2–714(2). Official Comment 3 makes clear that § 2–714(2) describes the usual standard and a reasonable method for calculating damages in the event of breach, but is not intended as an exclusive measure of damages. Read together, subsections (1) and (2) of § 2–714, provide that plaintiff may recover for its direct damages in any manner which is reasonable. *See* Official Comment 2 to § 2–714.

**35.** It bears repeating that this court must assume, for purposes of this motion, that Westinghouse has been willfully dilatory in rendering repairs or has repudiated its contractual obligation of repair or replacement. There is little doubt that such issues are questions of fact that cannot be resolved on a motion for summary judgment. *See, e. g., Jones &*

sence, defendant argues that even if the Guarantee clause is inapplicable, the Limitation of Liability clause stands independently of the Guarantee clause and expressly precludes the recovery of consequential damages.[36] *See V–M Corp. v. Bernard Distrib. Co.,* 447 F.2d 864 (7th Cir. 1971); *County Asphalt Inc. v. Lewis Welding & Engineering Corp.,* 323 F.Supp. 1300 (S.D.N.Y. 1970), *aff'd,* 444 F.2d 372 (2d Cir.), *cert. denied,* 404 U.S. 939, 92 S.Ct. 272, 30

*McKnight Corp. v. Birdsboro Corp.,* 320 F.Supp. 39, 45 (N.D.Ill.1970).

**36.** Resolution of this issue is complicated by the fact that there is a dispute as to which state law is to govern this controversy. It is unfortunate that despite a submission of documents on this motion in excess of eight feet, the parties have treated this issue in a battle of footnotes. Be that as it may, it is Westinghouse's contention that the State of Pennsylvania has the most significant relationship and contacts with the Mitchell Unit I contract and with the parties to it. *See, e. g., Bache & Co., Inc. v. International Controls Corp.,* 339 F.Supp. 341, 347 (S.D.N.Y.) *aff'd,* 469 F.2d 696 (2d Cir. 1972); *Auten v. Auten,* 308 N.Y. 155, 124 N.E.2d 99 (1954). *See also* UCC § 1–105. Thus, it points out that many negotiating sessions were held at Westinghouse's Pennsylvania facilities; the contract was made in Pennsylvania; a substantial portion of the performance of the contract—design, manufacture, testing, and much repair work—took place therein; the turbine-generator was delivered in Pennsylvania; and that state is the place of incorporation, and contains the principal place of business, of Westinghouse.

AEP argues that Pennsylvania law should not govern, apparently opting for the application of New York law. As such, plaintiff notes that the principal meetings concerning the contract negotiations took place in New York; the contract was executed on behalf of the Appalachian Power Company in New York, the American Electric Power Company and American Electric Service Corporation (which conducted the negotiations on behalf of the AEP system) are incorporated in New York while none of the plaintiffs is incorporated in Pennsylvania.

The question of the applicable state law which will govern this controversy is an issue of fact which cannot be resolved on the present record. For the purposes of this branch of the motion, it is sufficient to note that the decisions reached herein are, in my view, valid regardless of which state's law is ultimately found to govern.

**37.** Westinghouse alternatively argues that plaintiffs cannot recover consequential damages, irrespective of the validity of the Guaran-

L.Ed.2d 252 (1971). *See also, Wyatt Indus., Inc. v. Publicker Indus., Inc., supra; Potomac Electric Power Co. v. Westinghouse Electric Corp., supra.*[37]

In response, plaintiffs take the position that once a limited remedy, such as the warranty to repair or replace, has failed of its essential purpose, a buyer may resort to all the remedies for breach provided in the Uniform Commercial Code without regard to any contractual limitation of liability.

tee and Limitation of Liability provisions, since the parties did not contemplate that Westinghouse would assume such a risk. In particular, defendant asserts that the rule in Pennsylvania is that consequential damages may be recovered only if the parties contemplated, or tacitly agreed, that the risk of those damages would shift to the seller. *See, e. g., Keystone Diesel Engine Co. v. Irwin,* 411 Pa. 222, 191 A.2d 376, 378 (1963); *Taylor v. Kaufhold,* 368 Pa. 538, 84 A.2d 347 (1951).

In *Keystone, supra,* the Pennsylvania Supreme Court, referring to § 2–714(2) of the Code set out the following test for allowing consequential damages:

" 'Special circumstances' entitling the buyer to damages in excess of the difference between the values as warranted and the value as accepted exist where the buyer has communicated to the seller at the time of entering into the contract sufficient facts to make it apparent that the damages subsequently claimed were within the reasonable contemplation of the parties."

191 A.2d at 378.

*See also, Jones & McKnight Corp. v. Birdsboro Corp.,* 320 F.Supp. 39, 45 (N.D.Ill.1970), construing *Keystone* as requiring a tacit agreement that consequential damages would be recoverable. *Cf. Adams v. J. I. Case Co., supra,* 261 N.E.2d at 9.

If Pennsylvania law is not applicable to this controversy, it is clear that the "tacit agreement" test is no longer appropriate in determining the recovery of consequential damages. *See* U.C.C. § 2–715, Official Comment 2. Even under Pennsylvania law, at least one Pennsylvania court has suggested that the result in *Keystone* could have been reached entirely within the framework of § 2–715 of the Code. *See, R. I. Lampus Co. v. Neville Cement Products Corp.,* 232 Pa.Super. 242, 336 A.2d 397, 403 (1975). In any event, a "tacit agreement" rule would call for a determination of contract interpretation or intent that cannot be resolved on the present record. Thus, this issue is clearly inappropriate for summary judgment. *See, e. g., Heyman v. Commerce and Industry Insurance Company, supra.*

Thus, AEP would have us read the warranty of repair or replacement and the limitation of liability clause as dependent provisions, such that if the exclusive remedy of repair and replacement has not been met, defendant would not be entitled to rely on the contractual exclusion of consequential damages. This, plaintiffs suggest, is the result contemplated by U.C.C. § 2–719(2) which provides:

> "(2) where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Act."

In support of this position, plaintiffs place primary reliance on four cases—*Riley v. Ford Motor Co.,* 442 F.2d 670 (5th Cir. 1971); *Adams v. J. I. Case,* 125 Ill.App.2d 388, 261 N.E.2d 1 (1970); *Jones and McKnight Corp. v. Birdsboro Corp.,* 320 F.Supp. 39 (N.D.Ill.1970); and *Koehring Co. v. A. P. I., Inc.,* 369 F.Supp. 882 (E.D.Mich. 1974).

In *Adams, supra,* the court refused to dismiss claims for both direct and consequential damages as a matter of law despite contractual provisions that repair or replacement was "in lieu of all other warranties" and that in no event would defendant be liable for consequential damages of any kind. The court held:

> "The manufacturer and the dealer have agreed in their warranty to repair or replace defective parts while also limiting their liability to that extent. Had they reasonably complied with their agreement contained in the warranty they would be in a position to claim the benefits of their stated limited liability and to restrict plaintiff to his stated remedy. The limitations of remedy and of liability are not separable from the obligations of the warranty. Repudiation of the obligations of the warranty destroy its benefits. The complaint alleges facts that would constitute a repudiation by the defendants of their obligations under the warranty, that repudiation consisting of their

wilful failure or their careless and negligent compliance. It should be obvious that they cannot at once repudiate their obligation under their warranty and assert its provisions beneficial to them." 261 N.E.2d at 7–8.

In *Jones & McKnight Corp. v. Birdsboro Corp., supra,* the court, applying Pennsylvania law, agreed with the rationale expressed in *Adams.* It held as follows:

> "Although the plaintiff-buyer purchased and accepted the machinery and equipment with the apparent knowledge that the seller had properly limited its liability to repair or replacement, and although the plaintiff does not allege any form of unconscionability in the transactions which led to the purchase, plaintiff also was entitled to assume that defendants would not be unreasonable or wilfully dilatory in making good their warranty in the event of defects in the machinery and equipment. It is the specific breach of the warranty to repair that plaintiff alleges caused the bulk of its damages. This Court would be in an untenable position if it allowed the defendant to shelter itself behind one segment of the warranty when it has allegedly repudiated and ignored its very limited obligations under another segment of the same warranty, which alleged repudiation has caused the very need for relief which the defendant is attempting to avoid. If the plaintiff is capable of sustaining its burden of proof as to the allegations it has made, the defendant will be deemed to have repudiated the warranty agreement so far as restricting plaintiff's remedies, and the exclusive remedy provision of the contract will be deemed under the circumstances to have failed of its essential purpose, thus allowing plaintiff the general array of remedies under the Code." 320 F.Supp. at 43–44.[38]

In *Riley v. Ford Motor Co., supra,* the Fifth Circuit Court of Appeals upheld the district court's charge to the effect that it

---

**38.** In *Koehring Company v. A. P. I., Inc., supra,* the court adopted the reasoning of *Adams* and *Jones,* holding, under Michigan law, that a

court would refuse to limit seller's liability where the contract's exclusive remedy had failed of its essential purpose.

was for the jury to decide whether "the defendant, Ford Motor Company, had breached its warranty and [whether] they were given a reasonable opportunity to repair it, and they didn't." Despite the presence of a warranty of repair or replacement, coupled with a limitation of liability provision, the court refused to conclude that the jury "was justified in its implicit finding that the warranty operated to deprive the purchaser 'of the substantial value of the bargain.'" 442 F.2d at 673.

In support of its position that the Limitation of Liability provision stands independently of the contract's warranty clause, defendant Westinghouse places primary reliance on two cases: *V–M Corp. v. Bernard Distrib. Co.,* 447 F.2d 864 (7th Cir. 1971), and *County Asphalt, Inc. v. Lewis Welding and Engineering Corp.,* 323 F.Supp. 1300 (S.D.N.Y.1970), *aff'd,* 444 F.2d 372 (2d Cir.), *cert. denied,* 404 U.S. 939, 92 S.Ct. 272, 30 L.Ed.2d 252 (1971).

In *V–M Corp. v. Bernard Distrib. Co., supra,* the Seventh Circuit found that the defendant had substantially performed under its warranty of repair or replacement. The court went on to add:

"Moreover, we are not persuaded that Section 2–719(2) otherwise requires the negation of the specific limitations of the contract. Section 2–719 was intended to encourage and facilitate consensual allocations of risks associated with the sale of goods. This is particularly true where commercial, rather than consumer sales are involved. Even where the defects of the goods cause substantial difficulties to those involved in wholesale and retail distribution, Section 2–719(2) need not automatically require disregard of the partic-

ular limitations upon liability specified by the contracting parties. Here we cannot say that the defects in the quality of V–M's goods caused a failure of consideration for the distributorship agreement which would justify altering the particular allocation of these costs by making the manufacturer the insurer of distributor profits and extraordinary expenses. We see nothing in this record to justify protection of the distributor's profits or expenditures at the expense of the manufacturer's." [39]

447 F.2d at 869.

Similarly, in *County Asphalt, Inc. v. Lewis Welding & Engineering Corp., supra,* this court (Croake, J.) prior to the jury's verdict, made the following ruling on the enforceability of a contractual limitation of liability independent from a warranty of repair or replacement:

"Plaintiff would have UCC 2–719 read in such a fashion as to result in all limitations whatsoever being stricken in any event in which an exclusive remedy should fail of its essential purpose. A better reading is that the exclusive remedy clause should be ignored; other clauses limiting remedies in less drastic manners and on different theories would be left to stand or fall independently of the stricken clause. Since the clause excluding consequential damages has been held not unconscionable, and is not otherwise offensive, it will be applied."

323 F.Supp. at 1309.[40]

I am persuaded that the interpretation of § 2–719(2) of the Uniform Commercial Code urged by the defendant is the more appropriate one given the facts of this case. This is so for several reasons.

**39.** In *Koehring, supra,* the court declined to read *V–M Corp.* as a retreat from the decisions in *Adams* and *Jones.* Rather, the court read the language quoted above as referring to a situation in which the seller fulfills its obligation to repair or replace but the buyer suffers substantial losses nonetheless. In such a situation, the court suggested, the opinion in *V–M Corp.* stands for the proposition that even though the seller fulfills its obligations, a court may nonetheless find that the essential purpose

of the remedy had failed. 369 F.Supp. at 889. Here, however, the essential purpose of the remedy has not failed since plaintiffs maintain an adequate remedy for breach.

**40.** It is particularly significant that the court in *County Asphalt,* which reached its decision under Ohio law, indicated that the result would have been the same under the law of New York—the law which plaintiffs urge should apply to this controversy. 323 F.Supp. at 1309.

First, there is no reason to disturb the consensual allocation of business risk embodied in the Mitchell Unit I Contract. One provision of that contract contains defendant's warranty to repair or replace defective parts. A totally separate provision expressly limits the defendant's liability such that special or consequential damages may not be recovered. *See Koehring Company v. A. P. I., Inc., supra,* 369 F.Supp. at 890. As the court held in *County Asphalt, supra,* where an exclusive remedy (such as a warranty to repair or replace) fails of its essential purpose, it may be ignored, and other clauses in the contract which limit remedies for breach may be left to stand or fall independently of the stricken clause. Since it cannot be said that the Limitation of Liability provision in the Mitchell Unit I contract is unconscionable it must be given effect.[41]

Second, it must be emphasized that the contract here in issue is not of the type entered into by the average consumer, but a commercial agreement painstakingly negotiated between industrial giants. Further, the rule that the agreed-upon allocation of commercial risk should not be disturbed is particularly appropriate where, as here, the warranted item is a highly complex, sophisticated, and in some ways experimental piece of equipment. Moreover, compliance with a warranty to repair or replace must depend on the type of machinery in issue. In the case of a multi-million dollar turbine-generator, we are not dealing with a piece of equipment that either works or does not, or is fully repaired or not at all.[42] On the contrary, the normal operation of a turbine-generator spans too large a spectrum for such simple characterizations. It is for this very reason that the Mitchell Unit I contract incorporates within it the limitation on the Seller's liability.

Third, and perhaps most importantly, this is not a case where the failure to repair or replace—if indeed there has been such a failure—leaves the plaintiff without at least a "minimum adequate remedy." In this regard, Official Comment 1 to § 2–719 of the Uniform Commercial Code provides as follows:

"Under this section parties are left free to shape their remedies to their particular requirements and reasonable agreements limiting or modifying remedies are to be given effect.

"However, it is of the very essence of a sales contract that at least minimum adequate remedies be available. If the parties intend to conclude a contract for sale within this Article they must accept the legal consequence that there be at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract. Thus any clause purporting to modify or limit the remedial provisions of this Article in an unconscionable manner is subject to deletion and in that event the remedies made available by this Article are applicable as if the stricken clause had never existed. Similarly, under subsection (2), where an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this Article."

Unlike the contractual limitations of liability at issue in the cases cited by the plaintiffs, the Mitchell Unit I contract specifically provides for a damage recovery

---

**41.** Unconscionability rarely exists in a commercial setting involving parties of equal bargaining power. *See U. S. Fibres, Inc. v. Proctor & Schwartz, Inc.,* 509 F.2d 1043, 1048 (6th Cir. 1975); *County Asphalt, Inc. v. Lewis Welding & Engineering Corp., supra.*

**42.** *Cf. Riley v. Ford Motor Co., supra,* wherein the court noted that it would

". . . agree with the appellee's contention that at some point after the purchase of a new automobile, the same should be put in good running condition, that is, the seller does not have an unlimited time for the performance of the obligation to replace and repair parts. * * * This is not more than saying that at some point in time, it must become obvious to all people that a particular vehicle simply cannot be repaired or parts replaced so that the same is made free from defect."
442 F.2d at 673 n.5.

distinct from the warranty to repair or replace. Thus, the contract provides that:

"... The remedies of the purchaser set forth herein are exclusive, and the liability of Seller with respect to any contract, or anything done in connection therewith ... whether in contract, in tort, under any warranty, or otherwise, shall not, except as expressly provided herein, exceed the price of the equipment of [or] part on which such liability is based."

In the event that this court finds that the defendant has totally failed to perform its warranty to repair or replace, damages at least in an amount equal to the price of all uncorrected parts will be recoverable. Thus, if the generator, as a unit, cannot or has not been repaired so as to meet contract specifications, and has not been replaced by a generator that can, the full purchase price of the generator may be recovered as damages by the plaintiff.[43] Moreover, if plaintiffs' direct damages exceed this amount they may be recoverable as well, since the contract precludes the recovery of consequential damages only. Accordingly, defendant's motion for summary judgment precluding plaintiffs from recovering consequential damages is hereby granted.

With respect to the grant of summary judgment on the issue of recovery for consequential damages, two points must be clarified. First, it is impossible for me, on the present record, to determine precisely which elements of damages sought by the plaintiffs fall into the category of "consequential" as opposed to "direct" damages. Section 2–715(2) of the Uniform Commer-

cial Code defines consequential damages as follows:

"Consequential damages resulting from the seller's breach include

(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

(b) injury to person or property proximately resulting from any breach of warranty."

In general, the precise demarcation between direct and consequential damages is a question of fact, and the commercial context in which a contract is made is of substantial importance in determining whether particular items of damages will fall into one category or the other. *See Applied Data Processing, Inc. v. Burroughs Corp.*, 394 F.Supp. 504, 509 (D.Conn.1975). In this case, however, the parties have gone a long way in defining the scope of consequential damages in the contract itself. Thus, the parties agreed in the Limitation of Liability provision that:

"Except as otherwise agreed herein, the Seller shall not be liable for special, or consequential damages, such as, but not limited to, damage or loss of other property or equipment, loss of profits or revenue, loss of use of power system, cost of capital, cost of purchased or replacement power, or claims of customers of purchaser for service interruptions."

It is therefore likely that many of the categories of damages sought by the plaintiffs will ultimately be deemed consequential

---

**43.** Several courts have held that under Pennsylvania law a seller *may* be held liable for consequential damages even where recovery of such damages is expressly excluded in the contract where the seller has been guilty of willful and dilatory behavior in not honoring its express warranty. *United States Fibres, Inc. v. Proctor & Schwartz, Inc.*, 358 F.Supp. 449, 465 (E.D. Mich.1972), aff'd, 509 F.2d 1043 (6th Cir. 1975); *Jones & McKnight Corp. v. Birdsboro Corp.*, supra, 320 F.Supp. at 43, citing *Adams v. J. I. Case Company, supra*. *See also, Potomac Electric Power Company v. Westinghouse Electric Corp., supra*, 385 F.Supp. at 579. This authority is particularly significant in light of

the defendant's assertion that Pennsylvania law should govern the controversy. Nevertheless, I am of the view that even if Pennsylvania law is ultimately found to govern, my decision with respect to the recovery of consequential damages stands. First, this court is not bound by the pronouncements of other federal district courts relative to their view of how the highest court of Pennsylvania might interpret § 2–719(2) of the Uniform Commercial Code. Furthermore, I am of the view that a Pennsylvania court, if faced with the facts of this case, would interpret § 2–719(2) of the Uniform Commercial Code in a manner consistent with the opinions expressed herein.

within the meaning of § 2–175 of the Code, and will not be recoverable.[44] In any event, however, the precise scope of direct damages must be left for resolution at trial. Suffice it to say that the scope of direct damages recoverable by plaintiffs, should they prevail at trial, must provide a "fair quantum of remedy for breach of the obligations or duties outlined in the contract." UCC § 2–719, Official Comment 1.

Second, the contractual limitation of liability precluding the recovery of consequential damages cannot be effective if plaintiffs' claims of fraudulent inducement are sustained at trial. The defendant cannot be heard to rely on the provisions of a contract which was entered into as a result of fraudulent actions on defendant's part. *See* 6A *Corbin on Contracts* § 1472 (1962), at 606. Indeed, this is the result contemplated by § 2–721 of the Uniform Commercial Code, which provides as follows:

> "Remedies for material misrepresentation of fraud include all remedies available under this Article for non-fraudulent breach. Neither rescission or a claim for rescission of the contract for sale nor rejection or return of the goods shall bar or be deemed inconsistent with a claim for damages or other remedy."

### (e) Counterclaim

Westinghouse has moved for summary judgment on its counterclaim which seeks the recovery of $1,391,924.08, representing the balance due on the agreed-upon purchase price of Mitchell Unit I—plus interest. The motion is denied. It is axiomatic that a seller cannot recover what is due him under a contract until his performance under the contract has been demonstrated, and it is clear that plaintiffs have raised factual questions regarding adequate performance of the contract which will have to be resolved at trial.

Furthermore, § 2–717 of the Uniform Commercial Code permits the buyer the right to set-off its damages against that portion of the purchase price still owing under the contract.[45] Since the issues of contract performance and damages must await trial, the issue of set-off cannot be resolved at this time.

Finally, plaintiffs challenge the counterclaim as barred by the four-year statute of limitations of § 2–725(1) of the Uniform Commercial Code.[46]

The contract provides for installment payments on the purchase price tied to the date of shipment. It is plaintiffs' conten-

---

**44.** Plaintiffs seek damages for, *inter alia*, costs of replacement electricity, increased costs of operating less efficient units, increased fuel costs, lost profits, and loss of return on their capital investment in Mitchell Unit I. Plaintiffs' Complaint, ¶ 19.

Clearly, any items of increased costs incurred as a consequence of the breach will be considered as consequential damages. *See Potomac Electric Power Co. v. Westinghouse Electric Corp., supra,* 385 F.Supp. at 579. AEP contends that in reliance on Westinghouse's representations regarding the generating capability of Mitchell Unit I, it constructed ancillary plant equipment at a cost of over $100 million. Furthermore, plaintiffs contend that their reliance damages include their loss of investment on the balance of plant and equipment for which funds were expended in excess of what would have been spent had Mitchell Unit I had a smaller generating capacity.

Under the test enunciated in *Applied Data Processing, supra,* expenditures which are not incurred as a consequence of the breach, but were instead incurred before the breach occurred and in reliance on the contractual war-

ranties, are recoverable as direct damages. 394 F.Supp. at 508. The parties are free, however, to define for themselves the scope of their potential liability or potential remedy. Hence, to the extent that such elements of damages constitute "damage or loss of other property or equipment," or "cost of capital", they may not be recovered. Since this is an issue of contract interpretation, it cannot be resolved on a motion for summary judgment. *See Heyman v. Commerce and Industry Insurance Co., supra.*

**45.** Section 2–717 of the Code provides:

"The buyer on notifying the seller of his intention to do so may deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same contract."

**46.** Section 2–725(1) of the Code provides:

"An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it."

tion that shipment was completed by the Spring of 1969; that final payment was therefore due one year thereafter—i. e., Spring, 1970; and that inasmuch as Westinghouse first interposed its counterclaim on June 17, 1974, its claim is barred by the four-year statute of limitations.

Westinghouse argues that no final "authorized contract price" was agreed upon between the parties until September 29, 1971. *See* Defendant's Exhibit H, letter agreement between Ohio Power Company and Westinghouse Electric Corporation, September 29, 1971.[47] Thus, argues Westinghouse, since its right to the entire amount due on the contract did not accrue until that amount was finally determined in September, 1971, its counterclaim was timely. It is unclear to me, however, why minor modifications in the contract price previously authorized but later summarized in a September, 1971, letter would alter Westinghouse's right to receive payment on the dates specified in the contract. In any event, since an issue of fact has been raised regarding the time when payment under the contract was due, and hence the time when Westinghouse's cause of action for the price may be said to have accrued, *see* UCC § 2–725(2), consideration of this issue must be deferred until trial.

### SUMMARY OF DISPOSITIONS

1. Plaintiffs' motion to amend their complaint to add a claim for fraudulent inducement and misrepresentation is hereby granted.

2. Plaintiffs' motion to amend their reply to Westinghouse's counterclaim by adding a statute of limitations defense is hereby granted.

3. Defendant's motion to dismiss the claims of the "intended beneficiaries" is disposed of as follows: If Pennsylvania law governs, the non-signatory plaintiffs may not recover on the contract absent a showing that they were principals to the contract entered into on their behalf by Appalachian Power Company acting as their agent.

If New York law governs, plaintiffs may recover either as third-party beneficiaries of, or as principals to the Mitchell Unit I contract. Apart from these two theories of recovery, plaintiffs will be unable to assert their negligence or warranty causes of action. They will, however, be entitled to assert a claim for fraudulent misrepresentation.

4. Defendant's motion for summary judgment with respect to plaintiffs' implied warranty claim is hereby granted.

5. Defendant's motion for summary judgment with respect to plaintiffs' claims of fraud is hereby denied.

6. Defendant's motion for summary judgment with respect to plaintiffs' claims for breach of express warranties and for negligence is hereby denied.

7. Defendant's motion for summary judgment with respect to the recovery of consequential damages is granted to the extent indicated herein.

8. Defendant's motion for summary judgment on Count I of its counterclaim is hereby denied.

SO ORDERED.

---

47. The letter summarized various additions and deletions to the contract price and authorized a formal contract price change to reflect these items.